# Citizens Fidelity Bank & Trust Co. et al. v. Isaac W. Bernheim Foundation.

## Dummit v. Same.

November 11, 1947.

W. Scott Miller, Judge.

Andrew W. Duncan for appellants, Citizens Fidelity Bank & Trust Co. and others.

Eldon S. Dummit, Attorney General, and J. L. Hughett, Assistant Attorney General, for appellant, Eldon S. Dummit, Attorney General, of Kentucky.

S. L. Greenebaum and Selligman & Greenebaum for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Affirming.

In 1929 Isaac W. Bernheim caused a charitable corporation to be organized under the laws of Kentucky, styled "Isaac W. Bernheim Foundation," to which he conveyed several thousand acres of land lying in Bullitt and Nelson Counties. The purposes for which the Foundation was established are as follows:

"1. To afford means for further development in the people of Kentucky, regardless of race or creed, of love for the beautiful in art, music, and in natural life, and for kindred educational subjects, and to strengthen their love and devotion to the State of Kentucky and the United States, and the institutions which have made possible the development thereof.

"2. To establish and permanently maintain, an arboretum and herbarium for the raising of trees and shrubs, and to distribute, free of charge, throughout the State of Kentucky, such trees and shrubs grown on the lands of the Corporation (Foundation) in order that the work of the Corporation (Foundation) may add to the beautification of the highways, public parks and places in the State of Kentucky, and also that the Corporation may be an aid to the maintenance of forestration and re-forestration of the lands of the State of Kentucky.

"3. To provide a sacred sanctuary for the non-destructive wild birds and wild animal life, in order that their extinction may be prevented.

"4. To establish and permanently maintain an art gallery and to acquire and add thereto from time to time, objects of art, including painting, statuary, bronzes, porcelain, and all other kindred objects, both modern and antique, which may come under the nomenclature of artistic endeavor.

"5. To establish and permanently maintain, a museum of natural history patterned after and following the general lines of the Museum of Natural History of New York City."

In 1939 Mr. Bernheim created the Isaac W. Bernheim Trust, and transferred valuable securities to the original Trustees who were the predecessors of the appellant Trustees. The Trustees were directed to hold and administer the trust fund and, from the income and corpus, to make certain payments to him and the Foundation, which, in so far as relevant to the question presented on this appeal, are as follows: (A) To pay to him during his lifetime $5,000 per month from the income of the trust, and from the remaining income to pay to the Foundation such sums as during his lifetime he

might direct. (B) After his death, and until the construction of the museum, to pay to the Foundation out of the income of the trust the sum of $30,000 per year, to be used by the Foundation to promote the primary objects of the Foundation, to wit: "Fencing the entire property, building of roads, and gradual development of an arboretum along the general lines of plans made by Olmsted Bros., and for other improvements, such as maintaining fire lanes, and construction of such dams as may be necessary to fulfill the general purposes of the Foundation." (C) Seven years after Bernheim's death, if the corpus of the trust then should amount to as much as $1,950,000 or at such earlier date after his death as the corpus might amount to $3,500,000 to deliver to the Foundation a sum not in excess of $300,000, to be used by the Foundation in the erection and equipment of a museum of natural history to conform as nearly as possible to the plans prepared by Arthur Loomis previously procured by Mr. Bernheim. If any portion of the $300,000 remained unused after the erection and equipment of the museum, such unused portion was to be added to a fund of $150,000 which he directed the Trustees to deliver to the Foundation for the purpose of obtaining and installing exhibits of natural history in the museum. (D) After the completion of the construction of the museum, to pay the full income of the trust estate to the Foundation, to be "apportioned between the upkeep of the park, the museum, and other activities of the Foundation, as the Trustees of the Foundation determine." (E) If seven years after Mr. Bernheim's death the corpus of the trust estate should not equal $1,950,000, or had not equaled $3,500,000 previous thereto, he directed that the building of the museum should be abandoned and the Trustees should pay to the Foundation the entire net income of the trust estate, to be used for the primary purposes for which the Foundation was created.

Mr. Bernheim died April 1, 1945. On December 31, 1946, the trust estate was appraised at $3,885,090. For the calendar year 1946 the income of the estate was $155,739.56, and had averaged approximately $127,500 for the five year period preceding. The value of the trust estate having reached and passed the designated $3,500,000, the time for the building of the museum has

arrived; but its erection at this time is impossible, for the following reason: The museum, if built "along the lines of the plans of Olmsted Brothers," can not be built for $300,000, or for any amount less than $800,-000; thus the sum provided for its construction is inadequate under present economic conditions; and architects and engineers have estimated that the museum cannot be built for as small an amount as $300,000 for at least five years, and maybe not that soon.

Previous to his death Mr. Bernheim had plans drafted by engineers and architects to be used as guides by the Trustees of the Foundation in carrying out the purposes of the trust and the Foundation. Mr. J. Lafon, a forest engineer, drew plans for the development of the forest area. They called for the construction of fire lanes, fire trails, the erection of a fire tower, the installation of a telephone system, the establishment of nurseries, and fencing the entire fourteen thousand acres, for the purpose of reducing fire hazards. Mr. Lafon recommended for fire protection the employment of a ranger, a record keeper, and six other employees, at total annual salaries of $15,800; he further recommended that the Trustees expend $4,000 per year for planting, $1,500 per year for tree nurseries, and $2,200 per year for tools and supplies. Under this plan the Foundation would be required to expend $23,500 per year in the forest area alone. Olmsted Brothers, landscape architects, selected four hundred fifty acres within the boundary, within which to create and develop the arboretum. Plans for the development of this area include the establishment of nurseries, a greenhouse, a work shop, a garage, a service building, the museum, and living quarters for the personnel. The Olmsted Brothers' plans, which were adopted in general by Mr. Bernheim, recommended that eight thousand acres of the tract be used for public recreation. These plans require the building of five and one-half miles of roads through the forest and a road two and one-half miles long leading from the public highway to the arboretum. Picnic areas are to be cleared and eight lakes are to be built to provide water for the project and to provide suitable habitats for fish and migratory wildlife. A part of this work has been undertaken, but the remainder of the program, exclusive of the building of the museum

and the installation of the exhibits, will require the expenditure of $674,416 in capital outlay; and the planting and maintenance of the arboretum and forest will require the expenditure of $61,140 per year. The development of these areas during Mr. Bernheim's lifetime, and thereafter to the date of the filing of the petition herein, has been almost negligible because of the restrictions on the income made available to the Foundation during Mr. Bernheim's lifetime and since his death; and under a strict interpretation of the trust agreement, the development will remain at a standstill until after, if ever, the completion of the construction of the museum.

To date the project has no supply of water or electricity. It has one mile of unsurfaced roadway leading into the premises from a temporary entrance. Such forest fire lanes as have been constructed have fallen into disrepair. Of the forty-two miles of boundary, twenty miles have been fenced securely, but the remainder has been fenced only with a single strand of wire which merely marks the boundary and is inadequate to protect the property from trespassers, game, or other destructive forces. The only buildings on the property are a modern log house occupied by the manager, a concrete block warehouse, a barn, a temporary work shop, and six tenant houses which are in bad repair. There is no road leading from the public highway to the site selected by Mr. Bernheim for the museum. The fourteen thousand acre tract consists of two separate parcels of hilly, wooded land, some of which is elevated as much as four hundred feet above the elevation of the lowest part of the boundary. Some of the land needs to be cleared and to be treated for soil conservation. The forest area needs thinning and replanting. Only six hundred of the eight thousand acres of forest have been cleaned or thinned. A fire tower and a telephone system for fire protection have been installed, but have not properly been maintained. Three lakes have been built and two nurseries have been installed. With the $30,000 per year that the Foundation now is receiving from the trust estate, it is impossible for the Foundation to perform the primary functions imposed upon it; and with the limited income it is impossible to do

the preliminary work indispensable to the commencement of the construction of a museum.

This action was instituted by the Foundation against the Trustees of the trust estate and the Attorney General of the Commonwealth who has been given certain visitorial powers over the Foundation. The action was instituted under Section 639a—1 to 639a—12, inclusive, of the Civil Code of Practice, seeking a declaration of rights and a construction of the trust agreement and the powers and duties of the Trustees of the trust estate and those of the Foundation. The Court is asked to adopt the cy pres doctrine, and under it to approve a plan which it is alleged will carry out each and every purpose for which the Foundation and the trust estate were created, although the sequence of the accomplishment and completion of the various purposes would be disturbed. Both appellants and appellee seek the same construction; but there exists a real controversy between them in respect to their right to proceed in accordance with the plan proposed, which is as follows: (a) Defer the building of the museum and the procurement of the exhibits to be placed therein until such time as its construction can be accomplished by the expenditure of not more than $300,000; (b) to release and immediately make available to the Foundation the entire net income of the trust estate, to be used by the Foundation in the expenditure of such sums as may be necessary to carry out the primary purposes of the trust which the settlor directed to be done in the event it should become necessary to abandon the construction of the museum.

"Cy pres," literally translated, means "So nearly (as nearly as may be)." The cy pres doctrine, as adopted by the English courts following the enactment of the Statute 43 Elizabeth of Charitable Uses, is: "Where the objects of the charity, and the mode of its application, are pointed out, but not with sufficient distinctness or certainty to be specifically and accurately enforced, the court will, under its cy pres doctrine, give it effect, as near the general intent as may be; and even where there is no specific mode or object pointed out, and in some cases where the object fails or ceases to exist, the court will, in respect of the general charitable purpose, devise a mode itself for giving it effect and employing

the charitable funds; supply an original want of trustees, or, if necessary, displace old, and create new ones.''

The above quotation has been taken from the majority opinion in the first case hereinafter cited. We call particular attention to the fact that the English construction permits the Court to substitute the object of the charity, should the settlor's object fail or cease to exist.

Almost invariably, where the cy pres doctrine has been invoked by one of the parties to an action in this Court, the adversary has responded that the doctrine never has been adopted in this State. Nothing could be further from the truth. The cy pres doctrine and the English construction of it were adopted by this Court in the year 1834, in Gass and Bonta v. Wilhite et al., 32 Ky. 170, 2 Dana 170, 177, 26 Am. Dec. 446. In that opinion, in addition to the words above quoted, the Court said:

''Notwithstanding the attention of counsel had been invited to the question, whether the statute 43d of Elizabeth, of charitable uses, was in force here, it was not contended, on the argument, that it was not. Our own reflections have not led to any plausible suggestion why it should not be considered as in force. It has never been repealed, nor is there any thing in it of so peculiar and local a character, as to exclude it from adoption, under the rule embracing all English statutes of a general character, prior to 4th James 1. It is treated as in force, and has been acted on, in several of the other states.

''The establishing of the fact, that it is still in force, relieves us from the necessity of investigating the very vexed question, as to the true extent of chancery power and jurisdiction over charitable uses, independent of that statute. It also relieves us from an investigation of the question, whether, according to the principles of the common law, there is here a defect or want of cestui que trusts, to take the use according to the apparent intent of the covenant of association; * * *. For, according to a construction of two hundred years, and which has been acted on in numberless cases, under that statute, neither of those circumstances will invalidate the trust, provided it be a charitable use.''

Since the rendition of that opinion the rule has been modified and its scope has been limited to the end that it has not been applied where the object of the charity fails or ceases to exist. But it has been upheld in so far as it permits a different mode or method for effectuating the purpose where the settlor's suggestion in that respect can not be carried out. In Moore's Heirs v. Moore's Devisees, 34 Ky. 354, 4 Dana 354, 29 Am. Dec. 417, in discussing the Statute of 43d Elizabeth, the Court said: "This statute has been construed in England as repealing, as to the cases within its scope, the mortmain acts; as making valid and availing charitable donations which would have been ineffectual at common law, in consequence of vagueness as to the object of the beneficiary, and also, as authorizing the appropriation cy pres of a charity to some suitable and congenial purpose of charity, not inconsistent with the general intent of the donor, and when no specific application has been directed by him, or that which had been designated failed or was illegal."

After further elaboration in respect to the history of the doctrine, the Court then resolved its final application in this jurisdiction, and from which no departure has been made. The writer of the opinion said: "We are satisfied that the cy pres doctrine of England is not, or should not be, a judicial doctrine, except in one kind of case; and that is where there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal, or inappropriate, or which happens to fail, has been prescribed. In such a case, a court of equity may substitute or sanction any other mode that may be lawful and suitable, and will effectuate the declared intention of the donor, and not arbitrarily and in the dark, presuming on his motives or wishes, declare an object for him. A court may act judicially as long as it effectuates the lawful intention of the donor."

The writer of the opinion then disclosed the reason for the Court limiting the application of the rule in our jurisdiction by excluding from its application the power of the Court to usurp the privilege of the donor of a charity in designating its beneficiary. He said: "But it (the Court) does not act judicially when it applies his (the donor's) bounty to a specific object of charity,

810

selected by itself merely because he had dedicated it to charity generally, or to a specified purpose which cannot be effectuated; for the court cannot know or decide that he would have been willing that it should be applied to the object to which the judge, in the plenitude of his unregulated discretion and peculiar benevolence, has seen fit to decree its appropriation—whereby he, and not the donor, in effect and at last, creates the charity.''

One of the late cases concerning our application of the doctrine is Kentucky Childrens Home v. Woods, 289 Ky. 20, 157 S. W. 2d 473, 475, wherein the Court said: ''Counsel for appellees state that the cy pres doctrine is not in effect in Kentucky. But in this they are mistaken. In so far as it requires the application of liberal rules of construction in order to uphold charitable bequests wherever it is possible to do so, it is credibly a fixed part of our jurisprudence. 'In its last analysis it is found to be a simple rule of judicial construction designed to aid the Court to ascertain and carry out, as nearly as may be, the intention of the donor'. American Jurisprudence, Vol. 10, page 676. It has never been adopted by our courts to the extent of supplying a beneficiary or purpose where these objects are not expressed by the donor. Gill's Ex'r v. Woman's Club of Louisville, 205 Ky. 731, 266 S. W. 378. But it is fully operative where 'there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal, or inappropriate, or which happens to fail, has been prescribed.' Moore's Heirs v. Moore's Devisees, 4 Dana 354, 29 Am. Dec. 417. See, also, the exhaustive treatise on the subject in the case of Gooding et al. v. Watson's Trustee, 235 Ky. 562, 31 S. W. 2d 919; and the recent case of Harwood et al. v. Dick, 286 Ky. 423, 150 S. W. 2d 704, citing with approval Moore's Heirs v. Moore's Devisees and other decisions of this court in harmony with the principles announced. Here the general charitable intent of the testator was made manifest by his numerous bequests to other charities. His specific charitable intent to aid in providing homes for helpless and abandoned children was manifested by the fourth clause of his will as we construe it. There is nothing in the record to indicate that he was interested in the continuity of the corporate existence of the

agency casually designated 'the Children's Orphans Home at Lyndon, Kentucky.' Technically, the termination of the corporate existence of the Kentucky Children's Home Society destroyed the capacity of that particular corporate entity to accept the bequest. Actually, it did no more than render unavailing the services of that particular corporate entity in administering the charity, at the same time bringing into existence another agency capable of more adequately administering it.''

The plan proposed by the parties to this action is one which does not change the object or beneficiary of the charity created by Mr. Bernheim. It merely changes the mode of accomplishment, and substitutes a legal, appropriate, and adequate method for one which must be recognized by all men to be inadequate at this time. The settlor himself provided that the construction of the museum should be abandoned under circumstances which he conceived would embarrass the accomplishment of the primary purposes of the trust. He could not, or at least did not, foresee at the time he created the trust that the building of the museum would require the expenditure of three times the amount originally estimated. Had he foreseen that possibility, we have little doubt that he would have made a provision to defer the building of the museum until such time as it could be accomplished by the expenditure of $300,000, or would have provided for its abandonment, or would have specified the very plan proposed by the parties to this action. Under the plan proposed, the Foundation does not propose to create a set of circumstances by which it may abandon the building of the museum, if ever its construction can be accomplished by the expenditure of the sum the settlor permitted to be used for the purpose. As was said in Kentucky Childrens Home v. Woods, supra, ''a state of facts calling more forcefully for the application of the cy pres doctrine as it exists in this state would be difficult to conceive.''

The judgment is affirmed.