**Virginia PEARL,**
**Plaintiff–Appellant–Cross–Appellee,**

v.

**KEYSTONE CONSOLIDATED INDUS-**
**TRIES, INC.,**
**Defendant–Appellee–Cross–Appellant.**

Nos. 88–2344, 88–2488.

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1989.

Decided Sept. 25, 1989.

Donald R. Jackson, Jackson, Mitchell & Collier, Peoria, Ill., for Virginia Pearl, plaintiff-appellant.

Lyle E. Pfeffinger, Patrick Murphey, Davis & Morgan, and Stephen D. Gay, Husch & Eppenberger, Peoria, Ill., for Keystone Consol. Industries, Inc., defendant-appellee.

Before CUDAHY, MANION and KANNE, Circuit Judges.

MANION, Circuit Judge.

Virginia Pearl, who is black, began working for Keystone Consolidated Industries, a steel products manufacturer, at its Bartonville, Illinois plant in 1966. After working in various clerical and secretarial positions through the years, Pearl was promoted to a Secretary "A" position in Keystone's Sales Department in 1979.

At the time Pearl worked in Keystone's sales department, Keystone divided its product lines into two groups. One group was "wire products," a group that included fence materials, barbed wire, and similar products. The second group was "industrial and construction products," a group that included steel bars, steel wire rods, and other products that Keystone sold to customers for further processing. Keystone similarly divided its sales department into two groups, one focusing its efforts on wire products and the other on industrial products.

Pearl was secretary for the industrial products group. She also served as secretary for Keystone's Customer Services Department, a separate sub-department within the sales department. The Customer Services Department employed four Customer Services Representatives, three for wire products, and one for industrial products. The Customer Services Representatives had a variety of duties, including taking telephone orders, arranging transportation for shipments to customers, and handling customer complaints. In her job, Pearl performed the typical secretarial duties, including typing, answering the phone, and the like. Besides those duties, however, Pearl also served as a backup for the customer services representatives and at times performed many, if not all, of the customer services representatives' functions.

During the early 1980's, Keystone was experiencing huge operating losses. The Bartonville facility itself lost about $2 million per month during January, February, and March of 1982. Keystone's steel and

wire operations were purchased in January 1982, and new ownership demanded that the plant's management take steps to restore profitability. Management responded by sharply reducing the plant's work force and restructuring the remaining work force.

As part of the restructuring, Keystone eliminated the Secretary A position in the industrial products group, and combined its duties with additional duties to create a new job position entitled "Sales Assistant." Nicholas Owens, the Bartonville Operations President, and Ken Kirschner, the general sales manager for industrial products, had to decide who to choose to fill the new position. Owens and Kirschner considered Pearl for the job, but decided that she was not qualified for it. Owens and Kirschner instead selected Dolores Tarkowski, a white employee, to fill the position. Because of the decisions to eliminate Pearl's Secretary A position and not to select her to fill the new Sales Assistant position, Keystone discharged Pearl on April 30, 1982.

Pearl filed a Title VII action against Keystone, alleging that Keystone had discharged her because of her race. At trial, Keystone contended that it had discharged Pearl because Tarkowski was more qualified than Pearl to perform the Sales Assistant's duties. Kirschner testified (by way of a deposition taken in an earlier proceeding Pearl had initiated before the Illinois Human Rights Commission) that he had envisioned the Sales Assistant as having three principal duties: secretarial duties (typing, etc.); backing up the wire products' Customer Services Representative and assuming primary customer service duty for certain products; and compiling new and detailed reports to supply timely data to sales department staff. According to Kirschner, the Sales Assistant's duties, particularly the new reporting functions, would entail a great deal more technical work than the old Secretary A position. Kirschner had been Pearl's direct supervisor for the last month or two before her firing. He had given her some simple reporting functions but noticed that she had difficulty with mathematics and seemed not to understand the numbers she was compiling or the reports' purpose. This led Kirschner to doubt that Pearl would be competent to handle adequately the Sales Assistant's reporting functions. Additionally, based on his observation of Pearl's work assisting the wire products' Customer Services Representative, Kirschner feared that Pearl could not adequately handle that task either.

As to Tarkowski, Kirschner testified that he relied heavily on the recommendation of Lee Murray, Keystone's Director of Material and Operations Services. Tarkowski had been Murray's secretary before being promoted to the position of Management Action Plan (MAP) Coordinator in the plant's wire mill scheduling department. Murray had been very impressed with Tarkowski's work. In evaluating Tarkowski, Murray had consistently given her the highest scores possible. Murray had also given Tarkowski more responsibility in her job, and had consistently recommended her for promotion. Based upon Murray's recommendation and evaluations, Tarkowski's education (a bachelor's degree in management) and his own understanding of the functions Tarkowski had performed as MAP Coordinator (which, according to Kirschner's understanding, included preparing reports similar to the ones he was anticipating the Sales Assistant would prepare), Kirschner concluded that Tarkowski was the person for the new Sales Assistant job.

Owens agreed that Tarkowski, not Pearl, was better qualified for the Sales Assistant's job. Owens based this conclusion partly on information he received from Kirschner, and partly from his own experiences with Pearl. Owens had worked with Pearl from October 1977 to September 1979. Owens testified that although he considered Pearl a good employee and a pleasant person to work with, she had only average secretarial ability, and he believed the Sales Assistant job was beyond her ability. Owens also placed great stock in Murray's recommendation of Tarkowski. According to Owens, Murray was a technically oriented, meticulous manager who demanded near-perfection from his secretary,

particularly in handling data and preparing reports. In Owens' mind, for Tarkowski to receive Murray's glowing praise had to have meant that Tarkowski was a superior employee.

The district court found that race was not a substantial motivating factor in the decision to discharge Pearl. The district court believed that Keystone had told the truth about its reasons for discharging Pearl. According to the court, Keystone discharged Pearl because her job had been eliminated and because Kirschner and Owens, the relevant decision-makers, believed Tarkowski was better qualified for the Sales Assistant's job.

The court's decision was essentially a decision to credit Owens' and Kirschner's testimony regarding their reasons for choosing Tarkowski over Pearl. We may not overturn that decision—or the resulting findings that Kirschner and Owens chose Tarkowski because she was more qualified and that race was not a substantial motivating factor in the decision to discharge Pearl—unless that decision and those findings were clearly erroneous. See Fed.R. Civ.P. 52(a); *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (ultimate finding in discrimination case governed by Rule 52's clearly erroneous standard).

Pearl insists that Owens' and Kirschner's testimony was "seriously inconsistent, ... contrary to established laws of nature ... fantastic ... [and] irreconcilably in conflict with documentary ... evidence ... or evidence of equivalent certainty." See *Bullard v. Sercon Corp.,* 846 F.2d 463, 466 (7th Cir.1988). For that reason, says Pearl, the district court clearly erred in believing it. Pearl argues that the evidence shows that Owens and Kirschner really had no problems with Pearl's performance. Pearl notes that the record contains no documents relating Owens' and Kirschner's concerns about Pearl's performance, and that there is no evidence that either had ever complained about Pearl's performance until required to explain why they had discharged her. Moreover, Pearl asserts that all other witnesses called to testify about her performance testified that she was doing a competent job. Pearl also asserts that the new Sales Assistant job was really nothing more than the job that she had already been competently performing, and that the new reporting requirements that Kirschner testified about were a myth. According to Pearl, the testimony shows that Tarkowski never did do all the reporting that Kirschner said the job would entail.

Pearl further asserts that the evidence shows that Owens and Kirschner really did not rely on Tarkowski's qualifications in choosing her to be the Sales Assistant. Pearl points out that Tarkowski received a less than glowing evaluation (a rating of 2.6 on a scale of 5) of her work as MAP Coordinator. According to Pearl, Kirschner testified that he had relied on Tarkowski's performance as MAP Coordinator. Pearl argues that if Tarkowski was performing so poorly as MAP Coordinator, it is incredible that Kirschner would have given her the Sales Assistant's job. Even if Kirschner and Owens were not aware of Tarkowski's poor performance as MAP Coordinator, it is inconceivable, says Pearl, that they would not have inquired about her performance on her most recent job. Finally, Pearl asserts that Owens and Kirschner did not really consider Tarkowski's education in deciding to choose her over Pearl because a college degree was not necessary to be the Sales Assistant; in fact, none of the Customer Services Representatives even had a college degree.

Nothing that Pearl raises convinces us that Kirschner's and Owens' stories were so incredible or fantastic that the district court had to reject their testimony as a matter of law. In fact, some of the points Pearl raises mischaracterize the record to some extent. For example, Kirschner's concerns about Pearl's ability to back up the industrial products Customer Services Representative were corroborated. Kirschner testified that he told the Customer Services Representative for industrial products to reduce Pearl's involvement in customer service in that area; the Customer Services Representative testified that Kirschner did tell him to reduce Pearl's cus-

tomer service involvement, and Pearl herself testified that after she began working for Kirschner she did not assist in customer services as much. Moreover, the Customer Services Representative testified about problems with Pearl's customer service work.

As another example, Kirschner did not unequivocally testify that he relied on Tarkowski's performance as MAP Coordinator in choosing her to be Sales Assistant. The most natural reading of his testimony states that he relied on his understanding that some of the reporting functions Tarkowski performed as MAP Coordinator were similar to the reporting functions he envisioned the Sales Assistant would perform. (The fact that Tarkowski did not ultimately do all the reporting Kirschner thought she would does not necessarily mean that Kirschner did not actually envision the new reports as being an important part of the Sales Assistant's job.) This reading is consistent with the evidence concerning Kirschner's and Owens' knowledge of Tarkowski's poor evaluation as MAP Coordinator: the district court found that it was unclear whether Kirschner saw the evaluation, and Owens testified that he himself did not see it. And it is not incredible to believe that Owens and Kirschner would not take the time to check more thoroughly into Tarkowski's performance as MAP Coordinator, given her education and academic record (mostly A's with a smattering of B's), and Murray's evaluations and recommendation. Owens and Kirschner knew that Murray demanded a lot from his employees, and judging from Murray's evaluations, Tarkowski consistently met or exceeded Murray's demands. And even though a college degree might not have been a prerequisite for the Sales Assistant's job, managers commonly consider education and academic credentials in making employment decisions, so it is not incredible to believe that Owens and Kirschner would have taken Tarkowski's education into account when considering her for the job.

■ Pearl has other quibbles with the evidence similar to the ones we have catalogued but there is no need to detail them all. At bottom, what Pearl has presented on appeal is a closing argument more appropriate for trial. The types of inconsistencies and conflicting inferences that Pearl raises are ones that fact-finders must typically sort out to determine which side of a story to believe. Even if Pearl's argument convinced us not to believe Owens and Kirschner, we could not reverse the district court, because it was not unreasonable to have believed them. Rule 52(a) recognizes that appellate second-guessing of district court factual determinations will rarely lead to "better" results in the long run because the trial judge is in the best position, and has the greatest expertise, to determine what and what not to believe. See *Anderson*, 470 U.S. at 574–75, 105 S.Ct. at 1511–12; *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1428 (7th Cir.1985). Since the district court's finding of nondiscrimination was "plausible in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511, it was not clearly erroneous.[1]

Besides attacking the district court's findings, Pearl argues that we must reverse and remand because the district court erred in denying her motion in limine that sought to exclude Kirschner's deposition from evidence. This argument is meritless.

■ The pretrial order in this case provided that if Pearl wanted to file a motion to exclude Kirschner's deposition, she had to file it "within such time as would allow the court to rule on the admissibility of the [deposition] well in advance of trial," and that the parties were to file "[a]ll other motions ... no later than two weeks in advance of the trial...." Pearl filed her

---

1. Pearl also argues that the district court erroneously demanded direct evidence of discrimination. This argument mischaracterizes the district court's findings. Although the court commented that there was no direct evidence in this case, it went on to comment that direct evidence ("a smoking gun") is not necessary but that the proven facts did not raise inferences that convinced him that it was more likely than not that Keystone had discharged Pearl because of race. As we noted in the text, that finding is not clearly erroneous.

motion in limine eleven days before trial. Although the pretrial order is ambiguous, a plausible reading of it is that "well in advance of trial" means either by or before the two-week deadline for filing other motions. Based on such an interpretation, Keystone argued in the district court, and now argues on appeal, that Pearl's motion was untimely. Pearl has not challenged that argument on appeal, and there is nothing in the record to indicate that Pearl challenged it below. All we can infer from Pearl's silence is that she cannot, or does not, contend that the motion in limine was timely. Since the motion in limine was untimely, the district court did not abuse its discretion in denying it.

Even if the motion was timely, the district court did not abuse its discretion by denying it. Kirschner's deposition was hearsay but it was admissible if Kirschner was unavailable, if the deposition was taken "in compliance with law," and if Pearl "had *an opportunity* and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1) (emphasis added). Pearl does not contend that Kirschner was not unavailable, nor does she contend that the deposition was not taken "in compliance with law." Her argument is that Kirschner's deposition was inadmissible because Keystone gave her only six days' notice of the deposition, that six days' notice was inadequate, and that she therefore was unable to appear at the deposition. Read charitably (Pearl did not even mention Rule 804 or the word "hearsay" in her appellate brief or in the motion in limine), this argument seems to say that Kirschner's deposition was inadmissible because Pearl did not have "an opportunity" to cross-examine Kirschner.

There are several problems with Pearl's argument. For one thing, Pearl has not bothered to explain to us or, as far as the record shows, to the district court, why six days' notice was unreasonable; in other words, she has not explained why she could not have appeared at the deposition on six days' notice (other than stating that the deposition was taken in North Carolina, which, without more, is hardly a sufficient reason in this day of jet travel). Moreover, the deposition was taken in compliance with the Illinois Human Rights Act, Ill. Ann.Stat., ch. 68, para. 8–104(F)(1) (Smith–Hurd 1989), which incorporates the Illinois rules for taking depositions in civil cases in court. The Illinois Supreme Court Rules provide that a party served with notice of a deposition, such as Pearl, may, by making a motion and showing cause, extend the time for taking the deposition. See Ill.Ann. Stat. ch. 110A, para. 206(a) (Smith–Hurd Supp.1989); Ill.Ann.Stat. ch. 110A, para. 206(a) (Smith–Hurd 1985). Pearl does not contend on appeal nor does the record show she contended in the district court that she ever moved to delay the deposition.

■ Absent any contention by Pearl that she moved to delay the deposition, and absent any argument by Pearl as to why six days' notice was insufficient for her to appear, we can only conclude that her nonappearance at Kirschner's deposition was voluntary. Therefore, Pearl had an "opportunity" to cross-examine Kirschner, and her failure to cross-examine was essentially her own decision. She cannot complain now that her failure to cross-examine Kirschner makes the deposition inadmissible. Cf. Advisory Committee Note (b)(1) to Fed. R.Evid. 804 ("no unfairness is apparent in requiring a party to accept his ... decision not to cross-examine"); Jack B. Weinstein and Margaret A. Berger, 4 *Weinstein's Evidence* § 804(b)(1)[2], at 804–75 (1988) ("Actual cross-examination is not required.... It is usually compatible with fair practice to make [a party] bear the consequences in the ... decision not to exercise that right.").

■ One final issue merits brief comment. Keystone filed a cross-appeal, claiming that the district court should have dismissed Pearl's claim as barred by res judicata because an Illinois state court had affirmed the Illinois Human Rights Commission's decision to dismiss her administrative action. We need not reach that issue because of our disposition of Pearl's appeal. We do note, however, that the cross-appeal was unnecessary. The district court's judgment was entirely in Key-

stone's favor. Rather than asking for any change in the judgment, Keystone is presenting an alternative argument for affirming that judgment, and Keystone could have done that simply by raising the issue in its responsive brief. Unnecessary cross-appeals accomplish nothing except to slow the appellate process by disrupting briefing schedules and by otherwise causing needless paper shuffling and confusion. See *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir.1987). We have said many times, and we say it again, that unless a party requests the alteration of a judgment in its favor, it should not file a notice of appeal or cross-appeal. *Id.* See also, e.g., *Transparent Products Corp. v. Paysaver Credit Union*, 864 F.2d 60, 61 n. 1 (7th Cir.1988); *Byron v. Clay*, 867 F.2d 1049, 1050–51 (7th Cir.1989).

We dismiss the cross-appeal, and AFFIRM the district court's judgment.