In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3163

WELLPOINT, INC.,

*Petitioner-Appellant,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 13585-05—**Diane L. Kroupa**, *Judge*.

ARGUED FEBRUARY 9, 2010—DECIDED MARCH 23, 2010

Before POSNER, ROVNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. The petitioner, WellPoint (successor to Anthem, Inc.), is a for-profit seller of health insurance policies through subsidiaries that include a number of Blue Cross Blue Shield insurance companies (licensees of the Blue Cross and Blue Shield Association). In the 1990s, the petitioner, when it was still Anthem, acquired three such companies, one each in Connecticut, Kentucky, and Ohio. Both the acquiring and the acquired

companies were at the time mutual insurance companies, so the mergers had no tax consequences; the members of Anthem and of the three acquired companies voted to merge and the mergers made them all members of Anthem, now WellPoint.

The acquired companies had been formed many years earlier as nonprofit entities dedicated to providing health-related benefits on a charitable basis, and that was their status when they were acquired. But sometime after the acquisitions, the attorneys general of the three states of the acquired companies each sued WellPoint charging that it was using the acquired assets to make profits, in violation of the restrictions that the charitable status of the acquired companies had placed on the use of their assets. The cases were eventually settled by WellPoint's paying $113,837,500 to the states. The Internal Revenue Service refused to allow WellPoint to deduct from its taxable income either that amount, or the legal expenses that it had incurred (another $827,595) in the litigation, as "ordinary and necessary" business expenses. 26 U.S.C. § 162(a). WellPoint challenged the ruling in the Tax Court and lost. The court held that WellPoint's settlement payments were capital expenditures and so could not be deducted as ordinary and necessary business expenses.

The parties disagree about the scope of appellate review of such a ruling. WellPoint argues that review should be plenary—we should give no deference to the Tax Court's determination. The government argues that we should defer to the ruling unless convinced that it is clearly erroneous.

Rulings on pure issues of law, such as the meaning of "ordinary and necessary business expense" or "capital expenditure," are subject to plenary review, while findings of fact are reviewed just for clear error. Controversy persists over the proper scope of appellate review of the application of a legal standard to the facts of a particular case (such rulings are often referred to confusingly as "ultimate findings of fact" or resolutions of "mixed questions of law and fact"). The better view, we (and others) have said in previous cases, e.g., *United States v. Frederick*, 182 F.3d 496, 499 (7th Cir. 1999); *Hartford Accident & Indemnity Co. v. Sullivan*, 846 F.2d 377, 384 (7th Cir. 1988); *Wright v. United States*, 809 F.2d 425, 428 (7th Cir. 1987); *Wright v. Commissioner*, 571 F.3d 215, 219 (2d Cir. 2009); *ASA Investerings Partnership v. Commissioner*, 201 F.3d 505, 511 (D.C. Cir. 2000), is that the clear-error standard should govern the review of a decision that applies a legal standard to particular facts. The district court (or, as in this case, the Tax Court, the decisions of which are reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury," 26 U.S.C. § 7482(a)(1); see, e.g., *ASA Investerings Partnership v. Commissioner*, *supra*, 201 F.3d at 511) has a greater immersion in the facts of a case than the court of appeals. Also, when a decision is fact-specific, plenary review is not required in order to maintain uniformity of legal principles throughout the circuit. An appellate court's "main responsibility is to maintain the uniformity and coherence of the law, a responsibility not engaged if the only question is the legal significance of a particular and

nonrecurring set of historical events*." Mucha v. King*, 792
F.2d 602, 605-06 (7th Cir. 1986).

This analysis implies that the clear-error standard
should govern the review of a ruling that a particular
expenditure was or was not an ordinary and necessary
business expense as distinct from a capital expenditure.
And so we held in *Reynolds v. Commissioner*, 296 F.3d 607,
612-15 (7th Cir. 2002). But we have to reckon with the
Supreme Court's statement that "the general characteriza-
tion of a transaction for tax purposes is a question of law
subject to review," *Frank Lyon Co. v. United States*, 435 U.S.
561, 581 n. 16 (1978). (By "review" the Court must have
meant *plenary* review, since factfindings are subject to
review, albeit just for clear error.)

Naturally this formula, given its sponsor, has been
recited in subsequent cases. E.g., *Wellons v. Commissioner*,
31 F.3d 569, 570 (7th Cir. 1994); *Dow Chemical Co. v.
United States*, 435 F.3d 594, 599 n. 8 (6th Cir. 2006). But
what does "general characterization" mean? Classifying
a particular expenditure as an expense on the one hand
or as a capital expenditure on the other is applying a
legal standard to facts. The *Dow* opinion interpreted
"general characterization" to include such classifica-
tions. We are dubious. A judge asked in a bench trial
to decide whether the defendant was negligent applies a
legal standard (the negligence standard) to the facts of
the case—and appellate review is deferential, *Thomas v.
General Motors Acceptance Corp.*, 288 F.3d 305, 307-08
(7th Cir. 2002); *Downs v. United States*, 522 F.2d 990, 999
(6th Cir. 1975); see generally *St. Mary's Medical Center of*

*Evansville, Inc. v. Disco Aluminum Products Co., Inc.*, 969 F.2d 585, 588-89 (7th Cir. 1992), as it should be according to our analysis. We don't see how a negligence case differs in this respect from this tax case.

We needn't wade deeper into this mire, however. For this is not a case in which the standard of review determines the outcome—a case in which we would affirm if the standard were clear error and reverse if it were mere error. We would affirm under either standard.

We'll begin our analysis by explaining the difference between a capital expenditure and an ordinary and necessary business expense, with the aid of examples.

The cost of buying a building is a capital expenditure because a building has "a useful life substantially beyond the taxable year," Treas. Reg. § 1.263(a)-2(a), which is the general understanding of "capital expenditure." See, e.g., *U.S. Freightways Corp. v. Commissioner*, 270 F.3d 1137, 1143-44 (7th Cir. 2001); *Crosley Corp. v. United States*, 229 F.2d 376, 379 (6th Cir. 1956); *Bruns v. Commissioner*, T.C. Memo 2009-168, 2009 WL 2030886, at *9. A capital expenditure is not deductible as a business expense in the year in which it is made; instead it must be depreciated over its useful life, and the amount of depreciation each year is all that is deductible that year. E.g., *Crosley Corp. v. United States*, *supra*, 229 F.2d at 379. In this way, cost is matched temporally with revenue, which is a desideratum of tax law.

The purchase price of a capital asset is not the only example of a capital expenditure. *Any* expenditure is capital if its "utility . . . survives the accounting period" in

which it is made. *Sears Oil Co. v. Commissioner*, 359 F.2d 191, 197 (2d Cir. 1966); see also *Clark Oil & Refining Corp. v. United States*, 473 F.2d 1217, 1219-20 (7th Cir. 1973). So an expense incurred to enhance the value of a capital asset must be capitalized, and thus amortized over the asset's remaining life.

In contrast, business expenses incurred in day-to-day operations are deemed ordinary business expenses and so (if they also are necessary, which in this context just means "appropriate and helpful," *Commissioner v. Heininger*, 320 U.S. 467, 471 (1943); *Welch v. Helvering*, 290 U.S. 111, 113-14 (1933) (Cardozo, J.)) they are deductible from the business's taxable income in the year in which they are incurred. Thus repairs to a building, which preserve but do not enhance the building's value, can be expensed, while improvements intended to increase the building's value have to be capitalized. *Moss v. Commissioner*, 831 F.2d 833, 835 (9th Cir. 1987) ("expenditures for permanent improvements or betterments made to increase the value of any property must be capitalized and depreciated over the useful life of the improvement"); *Connally Realty Co. v. Commissioner*, 81 F.2d 221, 221-22 (5th Cir. 1936); *Difco Laboratories, Inc. v. Commissioner*, 10 T.C. 660, 667 (1948); *Appeal of Illinois Merchants Trust Co.*, 4 B.T.A. 103, 106 (1926); Treas. Reg. §§ 1.162-4, 1.263(a)-1(a), (b). As further explained in the *Connally* opinion, "Repairs to a building are necessary, and regarded as ordinary although occasioned in unusual degree by storm, flood, or the like. But this building fell into no disrepair, nor was it physically injured in any way requiring restoration. The city altered its street with detriment to the desirability of portions

of the building for rent, but, so far as appears, without touching the building. The outlay was made in an effort to adapt the building to changed surroundings, but not to repair any physical damage to it." 81 F.2d at 221.

Just as repairs prevent a building from collapsing, so expenditures to defend title to the building (maybe someone is seeking specific performance of what he claims, and you deny, is your agreement to sell him the building) are incurred to protect the building against what from the owner's standpoint might be a loss equivalent to its collapsing. But such expenditures, because incurred to defend (or assert) the ownership of a capital asset, cannot be expensed.

The distinction may seem tenuous, but it is well established. See *Lark Sales Co. v. Commissioner*, 437 F.2d 1067, 1077 (7th Cir. 1970) (expenses "incurred for the purpose of defending and protecting the Medds' title or property rights in the Dairy Queen trade name and a trade phrase originated by the Medds . . . were capital in nature and not deductible as a business expense"); *Burch v. United States*, 698 F.2d 575, 579 (2d Cir. 1983); *Redwood Empire Savings & Loan Ass'n v. Commissioner*, 628 F.2d 516, 520-21 (9th Cir. 1980); *Melcher v. Commissioner*, T.C. Memo. 2009-210, 2009 WL 2950820, at *4-5; Treas. Reg. § 1.212-1(k) ("expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses"); Treas. Reg. § 1.263(a)-2(c).

The particular expenses involved in this case were incurred in defending a lawsuit. A business that is sued for unpaid taxes, say, or unpaid rent, is allowed to deduct its expenses in defending the suit as "ordinary" business expenses. *Trust Under the Will of Binham v. Commissioner,* 325 U.S. 365, 376 (1945); see also *Commissioner v. Tellier*, 383 U.S. 687, 689-90 (1966); *Commissioner v. Heininger, supra*, 320 U.S. at 471-72; *A.E. Staley Mfg. Co. & Subsidiaries v. Commissioner*, 119 F.3d 482, 487-91 (7th Cir. 1997); *Hauge v. Commissioner*, T.C. Memo 2005-276, 2005 WL 3214581 at *5-6. They are the sort of expense that is incurred to preserve the operation and profitability of the business rather than to acquire or retain or improve a specific capital asset, and thus are "ordinary and necessary" even though they are not as regular and predictable as costs of labor and materials. WellPoint claims that the cost of the settlement, and (what need not be discussed separately) the legal expenses that it incurred in the litigation, were "ordinary" because it was defending against claims that it was using its property—the assets of the acquired BCBS companies—improperly. On this view, WellPoint was like a landlord who is sued for violating the building code by failing to maintain his building properly. But the government argues that WellPoint was defending its title to the acquired assets, and we said that expenses incurred in defending title to a capital asset are not ordinary expenses. WellPoint ripostes that the attorneys general never questioned its title but merely its use of the assets for profit-making rather than charitable purposes.

Such disputes over characterization are resolved by application of what is called the "origin of the claim"

doctrine: costs incurred in defending a lawsuit are classi-fied as expenses or as capital expenditures depending on the nature of the claim that gave rise to the litigation. *United States v. Gilmore*, 372 U.S. 39, 48-49 (1963); *Dower v. United States*, 668 F.2d 264, 266 (7th Cir. 1981); *Clark Oil & Refining Corp. v. United States*, *supra*, 473 F.2d at 1219-21; cf. *A.E. Staley Mfg. Co. & Subsidiaries v. Commissioner*, *supra*, 119 F.3d at 489. In our hypothetical building-code case the landlord's litigation expenses were in lieu of proper maintenance, so they are treated like the repair expenses for which they are a substitute, and thus can be expensed. But if the landlord were defending against a suit for specific performance of a contract to sell the building, he would be defending the ownership of his capital asset and so the origin of the claim would be a dispute over title.

In each of the three suits out of which the present dispute arises WellPoint had acquired assets that were held in a charitable trust. Two of the suits asked that the assets be taken out of WellPoint's hands entirely and placed in charitable entities with which WellPoint would have nothing to do. The third, the Ohio suit, asked that the assets be placed in a charitable trust but left open the possibility that WellPoint might be the trustee. But whether the origin of a claim is a dispute over a capital asset or over the day-to-day operations of the business is not to be decided by reference to the outcome of the suit. *United States v. Gilmore*, *supra*, 372 U.S. at 48-49; *McKeague v. United States*, 12 Cl. Ct. 671, 674 (1987), affirmed, 852 F.2d 1294 (Fed. Cir. 1988); *Colvin v. Commissioner*, T.C. Memo. 2004-67, 2004 WL 516195, at *4-5.

Otherwise, as the Supreme Court explained in the *Gilmore* case, "if two taxpayers are each sued for an automobile accident while driving for pleasure, deductibility of their litigation costs would turn on the mere circumstance of the character of the assets each happened to possess, that is, whether the judgments against them stood to be satisfied out of income- or nonincome-producing property. We should be slow to attribute to Congress a purpose producing such unequal treatment among taxpayers, resting on no rational foundation." 372 U.S. at 48.

The remedy that the parties to a lawsuit seek, obtain, or agree on if they settle the case will sometimes be unrelated to the nature of the claim out of which the suit arose, as in *Barr v. Commissioner*, T.C. Memo 1989-420, 1989 WL 90207; see also *Lucas v. Commissioner*, 388 F.2d 472, 476 (1st Cir. 1967); *Yates Industries, Inc. v. Commissioner*, 58 T.C. 961, 971-72 (1972); Treas. Reg. § 1.212-1(m). Imagine a suit to establish the plaintiff's ownership of a building, and the parties agree in settling the suit that the defendant can retain the building but the plaintiff will be allowed to occupy it as a tenant. The origin of the claim would be a dispute over a capital asset, namely ownership of an asset that has a useful life of more than a year, even though the remedy would be what one might expect in a dispute between a landlord and a tenant over the terms of the lease. The parties' litigation expenses would have been incurred to secure or defend ownership of a capital asset, whatever the terms of the settlement.

Still, the remedy sought or ordered or agreed to can be a clue to the nature of the claim. *Lange v. Commissioner*,

T.C. Memo. 1998-161, 1998 WL 217892, at *3; *Estate of Block v. Commissioner*, T.C. Memo. 1988-159, 1988 WL 33528; cf. *Boagni v. Commissioner*, 59 T.C. 708, 713 (1973). And that might seem to be the case here, at least with respect to the settlement in the Ohio suit. WellPoint says it shows that the attorney general was just trying to prevent a misuse of the acquired assets. But this misses the distinction between legal and beneficial ownership. A trustee has title to the assets of the trust, but the beneficiaries are the real owners because they are entitled to the income or other benefits that the assets of the trust yield, minus only the trustee's reasonable fee for managing the assets. *Hatcher v. Southern Baptist Theological Seminary*, 632 S.W.2d 251, 252 (Ky. 1982) ("when property is held in trust the trustee holds the legal title and the beneficiary or beneficiaries are considered to be owners of the equitable title"); *Guitner v. McEowen*, 124 N.E.2d 744, 747 (Ohio App. 1954); *Restatement (Third) of Trusts* § 2 and comments d, f (2003); George Gleason Bogert, George Taylor Bogert & Amy Morris Hess, *The Law of Trusts and Trustees* § 1 (3d ed. 2009). The attorneys general were trying to strip WellPoint of its equitable ownership—its right to use the acquired assets for profit. Whether WellPoint remained the trustee was a detail.

Moreover, although the state officials settled for money, they did not claim that WellPoint had (yet) caused any harm to anyone by operating the acquired BCBSs for profit—that it had charged higher insurance premiums or provided less coverage or treated claims less generously. The $113 million that the attorneys general received (and handed over to charitable entities to hold and manage) was not damages; it was in lieu of their recovering the acquired assets.

A note of confusion has been injected by the plaintiffs' characterizing their claims as "cy pres" claims. The cy pres ("as near as") doctrine allows a court to alter a charity's objective if the original objective can no longer be achieved. The Earl of Craven—having in "mind the sad and lamentable visitation of Almighty God upon the kingdom, but more especially upon the Cities of London and Westminster, in the year 1665 and 1666, by the pestilence and great mortality, and the great necessity that there was for providing a pest house for the sick, and burying-place for the dead"—had established a trust for the maintenance of a pest house and plague pit. But when the Black Plague no longer ravaged the poor residents of St. Martin's-in-the-Fields, the trust was permitted to use some of its assets to help treat persons with other contagious diseases. *Attorney-General v. Earl of Craven*, 21 Beavan 392, 52 Eng. Rep. 910, 912, 918-19 (Ch. 1856); see also *National Foundation v. First National Bank of Catawba County*, 288 F.2d 831, 834-36 (4th Cir. 1961). But the trust would not have been allowed to substitute, for its pest house and plague pit, a shelter and burying place for homeless tabby cats, since that objective would not have been near its original and now unattainable one.

The doctrine has no application to this case. The dispute is remote from the standard cy pres case, in which the issue is whether charitable assets can be kept out of the hands of the residuary legatees even though the original objective of the charitable bequest can no longer be achieved. *Rice v. Stanley*, 327 N.E.2d 774, 784-85 (Ohio 1975); *Ministers & Missionaries Benefit Board of American*

*Baptist Convention v. Meriden Trust & Safe Deposit Co.*, 94 A.2d 917 (Conn. 1953); *Citizens Fidelity Bank & Trust Co. v. Isaac W. Bernheim Foundation*, 205 S.W.2d 1003, 1007-08 (Ky. 1947); *Restatement (Third) of Trusts* § 67 (2003). The original charitable objective of the acquired entities—namely the provision of health insurance—is not unattainable. What has happened rather is that the assets devoted to its attainment have been (according to the suits) unlawfully used to provide health insurance for profit; it's as if the assets had been stolen.

Before concluding we need to consider the alternative ground for affirmance—or purported ground for affirmance—advanced by the government in its brief and strongly urged by its lawyer at argument. More precisely, we need to consider whether we *can* consider the alternative ground.

The ground is that the settlement with WellPoint was in effect a partial restoration of the acquired assets to their rightful owners and that like any other repayment of money it was not a capital expenditure and therefore should have no tax consequences at all. Although the government asks us to affirm the Tax Court's judgment rather than to modify it, were we to accept the alternative ground this would amount to repudiating the court's holding that the costs incurred by WellPoint were capital expenditures, and would place a cloud over WellPoint's seeking to deduct the cost in the future as a capital expenditure to be amortized over the life of the acquired assets that WellPoint retains by virtue of having coughed up $113 million to keep them. Litigation

expenses designed to obtain or protect a capital asset are added to the basis (essentially, the cost) of the asset and thus increase the amount of depreciation that the owner of the asset can take as a deduction from taxable income over its remaining life. 26 U.S.C. § 1016; *Woodward v. Commissioner*, 397 U.S. 572, 574-79 (1970); *Lange v. Commissioner*, *supra*, at *3; *Noel v. Commissioner*, T.C. Memo 1997-113, 1997 WL 93310, at *7-9. That's WellPoint's fallback position, should we rule (as we have ruled) that it is not entitled to deduct the settlement and associated legal fees as ordinary and necessary business expenses.

Had the government wanted us to modify the Tax Court's *judgment*, it would have had to file a cross-appeal. E.g., *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999); *Morley Construction Co. v. Maryland Casualty Co.*, 300 U.S. 185, 190-92 (1937) (Cardozo, J.); *Doll v. Brown*, 75 F.3d 1200, 1207 (7th Cir. 1996); cf. Eugene Gressman et al., *Supreme Court Practice* 489-94 (9th ed. 2007). An appellant is permitted to file a reply brief after the appellee files his brief, and so an appellee who is also an appellant—that is, who is also seeking relief against the lower court's judgment—should have the same right to respond to his opponent's brief, and he invokes that right by filing his own appeal, called a cross-appeal. The filing of a cross-appeal also serves to alert the court to the dual role of the parties in the appeal.

But the government is not seeking relief against the Tax Court's judgment—though this conclusion depends on precisely what the "judgment" in a case is. The judgment is not the court's opinion or reasoning; it is the court's

bottom line, which in this case is the denial of the deduction sought by WellPoint in the tax years in question. The government asks us to modify the reasoning of the Tax Court so that in some future tussle with the Internal Revenue Service WellPoint will not be allowed to deduct depreciation of the settlement and litigation expenses.

But this just illustrates "that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, *although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it*." *United States v. American Railway Express Co.*, 265 U.S. 425, 435 (1924) (Brandeis, J.) (emphasis added); see also *United States v. New York Telephone Co.*, 434 U.S. 159, 166 n. 8 (1977); *Ruth v. Triumph Partnerships*, 577 F.3d 790, 796 (7th Cir. 2009); *Moss v. Kopp*, 559 F.3d 1155, 1161 n. 6 (10th Cir. 2009). To rule otherwise would lead to endless disputes over whether arguments by an appellee ostensibly defending the judgment were planting time bombs under the appellant. The cross-appeal rule is not so vital that it justifies haggling over borderline cases. Doubts should therefore be resolved against finding that the appellee's failure to file a cross-appeal forfeited his right to argue an alternative ground. See 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3904, pp. 198-209 (2d ed. 1992); see also *Pearl v. Keystone Consolidated Industries, Inc.*, 884 F.2d 1047, 1052-53 (7th Cir. 1989); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1987). Otherwise courts

will be sucked into inconclusive debates over whether something said in a district court opinion, though not preclusive by operation of res judicata or collateral estoppel (or stare decisis, because district court decisions do not have the force of precedent, e.g., *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007); *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1124 (7th Cir. 1987); *NASD Dispute Resolution, Inc. v. Judicial Council*, 488 F.3d 1065, 1069 (9th Cir. 2007)), nevertheless affects the rights of the appellee.

*United States ex rel. Stachulak v. Coughlin*, 520 F.2d 931, 937 (7th Cir. 1975), is a case that illustrates when the filing of a cross-appeal *is* required. The appellee, confined in the psychiatric ward of a state prison, brought a federal habeas corpus proceeding to gain his freedom. The district court found merit in his case and ordered him released from the prison unless the state gave him another commitment proceeding (in which the state's burden of proof would be greater) within 60 days. Without cross-appealing, the appellee argued that the statute under which he was confined was unconstitutional root and branch. We held that he could not make this argument without filing a cross-appeal because if his argument were accepted it would require his immediate release and preclude a further commitment hearing and thus change the judgment from conditional release in 60 days to unconditional release immediately. In this case, in contrast, the judgment does not require that WellPoint be permitted to treat its settlement and litigation expenses as a depreciable (and therefore over time a deductible) capital expenditure, and so the govern-

ment's argument that they shouldn't be so treated does not challenge the judgment, as distinct from reasoning by the Tax Court that might influence decision in a future case but would require no alteration in the judgment in the present one.

The strongest case that we've found (though not strong enough) for requiring the appellee to file a cross-appeal even though he isn't seeking to alter the judgment is *EEOC v. Chicago Club*, 86 F.3d 1423 (7th Cir. 1996). The defendant prevailed in the district court and on appeal argued an alternative ground for affirmance without having filed a cross-appeal. We rejected the alternative ground because the appellee did not have standing to raise it, and then remarked that "the fact that the [appellee] did not file a cross-appeal would also complicate our ability to resolve [the] important issue [raised by the appellee] even if standing were present." *Id*. at 1431-32. This was a dictum that even on its own terms did not go so far as to state that the appellee was *required* to file a cross-appeal.

And so we can address, at last, the merits of the government's alternative ground. We can be brief, as the ground is—groundless. It is true that if you receive money as a loan and repay it, the repayment is not deductible from your taxable income, because you never claimed to own the money you had borrowed. *Commissioner v. Tufts*, 461 U.S. 300, 307 (1983); *Vukasovich, Inc. v. Commissioner*, 790 F.2d 1409, 1413 (9th Cir. 1986); *Brenner v. Commissioner*, 62 T.C. 878, 883 (1975). But WellPoint always claimed (it still claims) to have equitable title to the assets it ac-

quired. The expenses that it reasonably incurred to defend that claim—the claim to own the assets free and clear—are capital expenditures, not repayments.

AFFIRMED.