In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-1204

E.T. PRODUCTS, LLC,

*Plaintiff-Appellant.*

*v.*

D.E. MILLER HOLDINGS, INC., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:13-CV-00424 — **Philip P. Simon**, *Judge.*

ARGUED SEPTEMBER 23, 2016 — DECIDED SEPTEMBER 20, 2017

Before RIPPLE, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Doug Miller and his son Tracy signed a broad noncompetition agreement when Doug sold his fuel-additives business, E.T. Products, to a group of investors in January 2011. Doug sold his other company, Petroleum Solutions, to John Kuhns about a year later. E.T. Products's new owners sued the Millers for breaching the noncompete by providing assistance to Kuhns as he learned the Petroleum Solutions business.

The Millers responded by attacking the noncompete as overbroad and unenforceable. They also pointed out that their assistance to Kuhns came at a time when Petroleum Solutions was E.T. Product's distributor, *not* its competitor. When E.T. Products severed its relationship with Petroleum Solutions at the end of 2012, Doug told Kuhns that the noncompetition agreement prevented further help and ceased assisting him. E.T. Products insisted that the act of advising its distributor was off limits and that Doug also violated the noncompete by failing to break a lease with Kuhns when he found another supplier. Ruling on cross-motions for summary judgment, the district judge held that the noncompetition agreement was enforceable but the Millers did not breach it.

This appeal requires us to apply some familiar principles of contract interpretation: contract terms are read reasonably, in the context of the entire document, and with the contract's textually evident purposes in mind. Read that way, the noncompetition agreement is not overbroad. Though enforceable, the evidence introduced at summary judgment establishes as a matter of law that the Millers did not breach the agreement. A company's distributor is not its competitor, so the Millers' assistance to Kuhns in 2012 was fair game. And the noncompete, read reasonably, did not require Doug to break his preexisting lease with Kuhns. We therefore affirm.

## I. Background

Doug Miller owned two companies located in Bremen, Indiana: E.T. Products, which blended and sold fuel-additive products, and Petroleum Solutions, which blended and sold lubricant products. Petroleum Solutions also supplied a few

customers with E.T. Products fuel additives. After a long career, Doug put his two businesses up for sale so that he could soon retire.

In January 2011 a group of investors led by Tom Blakemore purchased E.T. Products for $4.95 million. As part of the sale, Doug and his son Tracy signed essentially identical noncompetition agreements. (For ease of reference, we will refer to them as a single agreement.) The noncompete had a five-year duration and was quite broad in geographic scope and in the range of activities it proscribed. The agreement prohibited the Millers from assisting anyone involved in any company either directly or indirectly engaged in the same industry as E.T. Products anywhere in North America. The Millers were also forbidden to directly or indirectly own, operate, invest in, advise, render services for, or otherwise assist any such competitor.

After selling E.T. Products, Doug continued to own Petroleum Solutions for about a year until John Kuhns purchased it in January 2012. Doug was generous to Kuhns: He provided low-interest financing for the purchase, a lease for the land on which the business operated, training in lubricant blending, and consulting help as Kuhns learned the business. Tracy helped by training Kuhns on the company's computer programs for a few months after the sale.

At first Petroleum Solutions continued to purchase E.T. Products fuel additives for resale; that is, E.T. Products was its supplier. That changed in late 2012. At around that time, Blakemore fired Tom Patton, an E.T. Products salesman. When Doug learned of this development, he connected Patton to Kuhns, who hired him as a salesman for Petroleum Solutions. E.T. Products contends that Patton thereafter

began competing for its customers in violation of his own noncompetition agreement. In December 2012 E.T. Products ceased using Petroleum Solutions as its distributor and sued Patton and Petroleum Solutions to enjoin this competitive activity. The details of that litigation are not relevant here.

Petroleum Solutions found a new supplier and also began blending its own products. When Doug heard that E.T. Products had severed its relationship with Petroleum Solutions, he told Kuhns that he could no longer assist him in the additives business due to his obligations to E.T. Products under the noncompetition agreement. Kuhns's lease of the business property continued uninterrupted, but the Millers thereafter ceased all assistance to Kuhns and his business.

Litigation soon followed. The Millers filed suit in state court accusing E.T. Products of violating a release. E.T. Products responded with this federal suit accusing the Millers of breaching the noncompetition agreement. The cases were eventually consolidated in federal court, and the parties filed cross-motions for summary judgment.

After carefully reviewing the record, the judge delivered a split decision, ruling for the defense in each case. First, the judge awarded judgment to E.T. Products in the suit for violation of the release. The Millers have not sought review of that ruling, so we need say no more about it.

In the suit for breach of the noncompetition agreement, the Millers prevailed against E.T. Products, and that ruling is the subject of this appeal. The Millers maintained that the noncompete was overbroad and unenforceable, but the judge rejected that argument. The judge went on to hold,

however, that the evidence conclusively established that the Millers did not commit a breach because Petroleum Solutions did not directly or indirectly compete with E.T. Products during the time period when the Millers were assisting Kuhns.

## II. Discussion

Two issues are presented for our review: (1) is the non-compete enforceable and (2) did the Millers violate it? Issues of contract interpretation and enforceability are questions of law and the case comes to us from a summary judgment, so our review is de novo. *See Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 773 (7th Cir. 2016) ("The issue is contract interpretation and the posture is an appeal of summary judgment, so our review is de novo."); *Quality Oil, Inc. v. Kelley Partners, Inc.*, 657 F.3d 609, 612 (7th Cir. 2011). And since we're sitting in diversity and applying Indiana law, our task is to predict how the Indiana Supreme Court would rule if the case were before it. *Doermer v. Callen*, 847 F.3d 522, 527 (7th Cir. 2017).

### A. Enforceability of the Noncompete

One of the assets typically transferred in a business sale is goodwill, an intangible asset that includes the value of the company's reputation and customer relationships. That value is diminished if the seller, who developed that reputation and those relationships, competes with the buyer after the sale. For that reason the buyer often pays a premium for a noncompete agreement that removes the seller from the market.

Indiana courts generally disfavor noncompete restrictions and enforce them only if they are reasonable. *Dicen*

*v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005). But business-sale noncompete agreements, which usually involve parties with relatively equal bargaining power, "stand in better stead" than those in other contexts. *Id.* Compared to noncompete provisions in employment contracts—another common place to find them—those arising from business sales are "enforced on a more liberal basis." *Id.* at 685. Indiana courts recognize that in a business sale, "a broad noncompetition agreement may be necessary to assure that the buyer receives that which he purchased." *Id.* at 687 (quotation marks omitted).

The Millers challenge the scope of the geographic and competition restrictions in the noncompete agreement.[1] Our review of the scope of the competition restrictions is straightforward. The Indiana Court of Appeals has enforced a noncompete agreement with competition restrictions nearly identical to those here, *Kuntz v. EVI, LLC*, 999 N.E.2d 425 (Ind. Ct. App. 2013), and we have no reason to think the Indiana Supreme Court would see it differently. That means we must follow suit. *See City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 365 (7th Cir. 2010) ("When sitting in diversity, a federal court should follow the decision of an intermediate state appellate court unless it is convinced by other persua-

---

[1] E.T. Products contends that by failing to file a cross-appeal, the Millers waived this issue. Not so. A cross-appeal was unnecessary because the Millers do not seek to alter the district court's judgment. *Wellpoint, Inc. v. Comm'r*, 599 F.3d 641, 651 (7th Cir. 2010); *see also id.* at 650 ("The judgment is not the court's opinion or reasoning; it is the court's bottom line … ."). A successful challenge to the enforceability of the noncompete wouldn't alter the district court's judgment. The bottom line—the Millers prevail—would remain unchanged.

sive data that the highest court of the state would decide otherwise.") (internal quotation marks omitted).

The contract at issue in *Kuntz* contained "a nearly exhaustive list of roles in which [the seller] is prohibited from acting as a competitor." 999 N.E.2d at 430. Like the contract here, the noncompete in *Kuntz* prevented the seller from assisting a competitor directly or indirectly, and the state appellate court wrote that the "legal effect of the provision is to restrict all competitive activity in any capacity." *Id.* The Millers point to nothing that makes the competition restrictions in their noncompete more severe than those in *Kuntz*.

The geographic restraint, which covered the entire North American continent, requires a closer look. In assessing enforceability, Indiana courts first ask as a threshold matter whether the buyer purchased a protectable interest. *Fogle v. Shah*, 539 N.E.2d 500, 503 (Ind. Ct. App. 1989). Here, as with most business sales, that's goodwill. *See id.* at 502. Then comes a more difficult inquiry: whether the restrictions are reasonable. That question is analyzed under a three-part balancing test that considers the effect of the restrictions on the buyer, the seller, and the public. *Id.* at 503.

In this case all three parts of the test favor enforcement. The agreement only minimally affects the seller and the public since Doug planned to exit the market even without a noncompete. The nub of the case is the first factor—namely, whether the restrictions are broader than necessary to protect the buyer. This part of the test is "[o]f primary importance" and contains a multifactor inquiry of its own. *Id.* Indiana courts consider "(1) the type of business sold, (2) the effect of including territory into which the transferring

business did not extend, (3) the extent of the purchaser's original business as a factor, and (4) the period of restraint." *Id.*

Indiana courts separate businesses into one of three categories for purposes of evaluating whether a noncompete is too broad: service businesses, distributors of goods, and manufacturers. *Id.* at 504. Noncompete restrictions in service businesses "normally will be localized because services generally are performed within a small geographic area." *Id.* A company like E.T. Products that distributes or manufactures goods, on the other hand, can be expected to reach customers over a larger map, and a correspondingly broader geographic restriction may be necessary.

Moving to the second factor, the Millers point out that at the time of the sale, E.T. Products sold no goods in Mexico, had only one customer in Canada, and was inactive in many American states. But Blakemore attested that he bought the company with plans to expand it throughout the continent.[2] When that's the case and the seller can "fairly anticipate" the extent of the geographic expansion, the buyer "is entitled to bargain with the seller against competition within the territory into which he plans to extend" the business. *Id.* Blakemore cited the company's excess capacity, recent favorable environmental regulation, and his ownership of a multinational entity of a similar type as indicators that the

---

[2] In the district court, the Millers moved to strike Blakemore's affidavit as extrinsic evidence offered to modify the terms of the agreement. The judge denied the motion. He reasoned that the evidence was being used not to modify contractual terms but rather to determine the buyer's plans at the time of the sale. *See Fogle v. Shah*, 539 N.E.2d 500, 504 (Ind. Ct. App. 1989). We agree.

company was well positioned for expansion. The fact that Blakemore did expand the company across the continent within two years—to all 50 states and 7 Canadian provinces—provides further evidence that he had realistic plans to do so at the time of the purchase.

The third and fourth factors also weigh in E.T. Products's favor. Doug spent decades building his reputation and customer relationships and grew the company into 13 states, so the scope of the business corresponded to significant goodwill. Finally, the Indiana Supreme Court has concluded that a five-year time period is reasonable. *Dicen*, 839 N.E.2d at 688. So all four factors support the conclusion that the geographic restraint was reasonable. Blakemore bought the broad noncompetition restrictions at a price, and failing to enforce them would "deny him the benefit of his bargain." *Fogle*, 539 N.E.2d at 503.

## B. Breach of the Noncompete

The parties agree that the Millers assisted Kuhns from the time he purchased Petroleum Solutions in January 2012 until E.T. Products and Petroleum Solutions split in late 2012. They also agree that during this time period, Petroleum Solutions ventured no further into the additives business than to serve as a distributor of E.T. Products additives. E.T. Products insists that the Millers violated the noncompete by providing assistance to Kuhns during this time, notwithstanding that Petroleum Solutions was its own distributor, not a competitor. E.T. Products characterizes this as a prohibited form of an "indirect" involvement in its industry.

That's a bit much. We're talking about a non*compete* agreement after all. Staying true to its name, it was written with the express purpose of preventing the Millers from using their knowledge or relationships "to compete with" E.T. Products. And a firm whose sole conduct in the relevant market consists of distributing one manufacturer's product plainly isn't that manufacturer's competitor. The Millers' assistance during this period can't possibly violate the agreement.

There's no question, however, that Petroleum Solutions became engaged in E.T. Products's industry as a competitor after the two companies parted ways and it began blending its own additives and distributing additives from other suppliers. The judge thought that the noncompete wasn't triggered unless Petroleum Solutions engaged in *all* the same aspects of the additive business as E.T. Products: blending, packaging, marketing, and selling. That's not correct. Two companies need not perfectly mirror each other before they are considered competitors, and the inclusion of the phrase "directly or indirectly" in the noncompete was designed to preclude precisely this kind of narrow construction. That language means, if nothing else, that complete overlap isn't required. As a manufacturer and distributor of additives, Petroleum Solutions squarely competed with E.T. Products after the two companies parted ways.

But once Petroleum Solutions became E.T. Products's competitor, the Millers stopped training and advising

Kuhns. E.T. Products argues that Doug Miller continued to assist Kuhns by failing to revoke his property lease.[3]

But reading the noncompete to cover that kind of action (inaction, really) would "produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." *Beanstalk Grp. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002) (applying Indiana law). If the prohibition of indirect assistance were taken to its logical extreme, the Millers would be in breach, for example, if they helped a friend move into a new house and that friend happened to be an investor in a business indirectly engaged in the additives industry. The broadest possible reading of the noncompete would preclude all sorts of innocuous behavior, making the agreement overbroad and unenforceable. *See Dicen*, 839 N.E.2d at 688. We're required to give the noncompete a reasonable construction that doesn't entail a limitless reach. Collecting rent payments on a preexisting lease isn't the kind of assistance that the noncompete covers.

E.T. Products contends that *Kuntz* holds to the contrary. The contract at issue in *Kuntz* provided that the seller and buyer of a business would enter into a lease of the business property for a five-year term. 999 N.E.2d at 426. The seller didn't renew the lease at the end of the five years and instead leased the property to one of the buyer's competitors. *Id.* at 428. The Indiana Court of Appeals concluded that this

---

[3] E.T. Products also argues that Doug breached the noncompete agreement by eventually selling the property to Kuhns at what E.T. Products considers a low price. But E.T. Products did not develop this argument below, so we don't address it. *See Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005).

violated the parties' noncompete agreement, which (as we've noted) contained restrictions nearly identical to those in this case. *Id.* at 430.

Taking affirmative steps to lease to a competitor is quite different from what Doug Miller did here. Recall that Kuhns and Doug entered into the lease agreements in January 2012. At that point Petroleum Solutions and E.T. Products were business *partners*. No one knew that the relationship would be severed at the end of that year and they would later become competitors. On E.T. Products's reading of the noncompete, Doug was required to break the existing lease with Kuhns—itself a breach of contract—once Petroleum Solutions became E.T. Products's competitor. That's an overbroad and unreasonable reading of the agreement.

The stated purpose of the noncompete was to prevent business competition. Read reasonably and in light of that purpose, the agreement did not prohibit Doug from assisting Petroleum Solutions while it was an E.T. Products distributor or from continuing to honor Kuhns's preexisting lease.

AFFIRMED.