In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 17-2783

BRC RUBBER & PLASTICS,
INCORPORATED, an Indiana
corporation,

*Plaintiff-Appellant,*

*v.*

CONTINENTAL CARBON COMPANY, a
Delaware corporation,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:11-cv-00190-SLC — **Susan L. Collins**, *Magistrate Judge*.

_____

ARGUED FEBRUARY 21, 2018 — DECIDED AUGUST 16, 2018

_____

Before RIPPLE, KANNE, and HAMILTON, *Circuit Judges*.

RIPPLE, *Circuit Judge*. This case involves a contract dispute over the sale and purchase of carbon black, an important ingredient in rubber products. BRC Rubber & Plastics, Inc. ("BRC") seeks to recover from Continental Carbon Co. ("Continental") costs that it incurred in purchasing carbon

black from another supplier following Continental's alleged repudiation of the parties' supply agreement.

Initially, BRC claimed that the agreement was a requirements contract, *i.e.*, a supply agreement in which Continental promised to provide all of the carbon black that BRC required. Because Continental failed to do so, the district court awarded summary judgment to BRC.

In a prior appeal, we rejected the characterization of the agreement as a requirements contract and, therefore, vacated the judgment. In remanded proceedings, BRC, without amending its complaint, pursued the alternative theory that the agreement is for the supply of a fixed amount of carbon black. The district court granted summary judgment to Continental for two reasons: BRC's complaint failed to state a claim for relief under any theory of the agreement other than as a requirements contract; in the alternative, the agreement is unenforceable for a lack of mutuality and consideration.

BRC now appeals. For the reasons set forth in this opinion, we conclude that the parties' agreement is enforceable and that BRC can proceed on its alternative characterization of the contract as an agreement for a fixed amount of carbon black. We, therefore, reverse and remand the case for proceedings consistent with this opinion.

# I

## BACKGROUND

### A.

BRC produces rubber-based products for the automotive industry. Continental is a supplier of carbon black, a raw

material that is a key ingredient in rubber products. On January 1, 2010, BRC and Continental entered into a five-year agreement (the "Agreement"). Under its terms, Continental "agree[d] to sell to [BRC] approximately 1.8 million pounds of prime [carbon] black annually … to be taken in approximately equal monthly quantities."[1] The Agreement set out baseline prices for three different grades of carbon black (N339, N550, and N762) and stated that those prices were "to remain firm throughout the term."[2] In return, Continental obtained the right to review and meet any better offers that BRC received during the term.[3]

In 2010, Continental shipped 2.6 million pounds of carbon black to BRC. Shipments continued regularly into mid-2011, with Continental providing more than one million pounds by the spring of 2011. However, in March 2011, demand for carbon black began to exceed Continental's ability to produce it. In April 2011, Continental notified all of its buyers that the N762 grade of carbon black would be unavailable in May due to plant outages and lack of inventory. BRC nonetheless placed an order for 360,000 pounds of carbon black, including N762, for delivery in the coming weeks.

---

[1] R.6-1 at 1.

[2] *Id.*

[3] This obligation appears in the "Meet or Release" provision, which reads: "If during the term of this agreement BRC receives an offer that they believe is better tha[n] the terms offered in this agreement[,] Continental Carbon will have the right to meet this agreement or release BRC from any further obligation. Continental Carbon has the right to review the actual written offer. Only offers made in writing will be considered." *Id.*

The parties dispute the nature of their communications during this period. In mid-April 2011, a Continental sales representative emailed BRC's Vice President of Purchasing seeking to increase the baseline prices of carbon black by $.02 per pound. BRC rejected this request, citing the "firm" prices set out in the Agreement. In late April, the same Continental representative informed BRC that Continental might withhold shipments from BRC. Continental does not deny that this communication occurred but maintains that the representative, who was about to be terminated from the company, delivered a false message.

Given Continental's limited inventory and obligations to other customers, it neither confirmed BRC's last order nor shipped the requested carbon black. BRC's counsel then sent a letter to Continental, dated May 16, 2011, demanding immediate shipment of the unfulfilled order and immediate assurance that Continental would uphold its end of the bargain in the future. Continental responded that it did "not have N762 available at the moment."[4] As a result, on May 18, 2011, BRC purchased one railcar's worth of N762 from another supplier at a higher price than set forth in the Agreement.

Two days later, Continental offered to ship BRC multiple railcars of carbon black at price increases up to $.06 per pound. Continental claims that this offer mistakenly quoted higher prices than the Agreement. When BRC refused to pay higher prices, a Continental Director suggested that BRC

---

[4] R.6 at 4.

"call another supplier."[5] Continental maintains that this response was based on a misunderstanding. Indeed, within hours, counsel for both parties conferred and Continental's attorney sent an email to BRC stating that Continental would "continue producing and shipping timely at the contract prices, and would not cut off supply to BRC."[6]

Later that same day, BRC sought further confirmation as to when Continental would fulfill BRC's outstanding order. Continental responded, "we will ship one car next week and do the best we can re future orders based on our intent to supply 1.8 million lbs."[7] BRC requested a status update three days later, and Continental gave a similar response.

On the next business day, BRC again inquired about the status of its order, and Continental said that it would ship one railcar of carbon black the following day. At this point, Continental emphasized that the Agreement required it to supply only 1.8 million pounds per year—or approximately 150,000 pounds per month—and that it already had shipped 1.2 million pounds that year—or approximately 300,000 pounds per month. Continental shipped one railcar of carbon black to BRC the next day. Within a week, Continental emailed BRC seeking to increase the baseline prices again and to accelerate the payment terms in the Agreement. On June 2, 2011, BRC filed this lawsuit.[8]

---

[5] *Id.* at 5.

[6] *Id.*

[7] *Id.*

[8] Following the initiation of this lawsuit, Continental continued to supply carbon black to BRC at the contract prices until September 2011. Dur-

(continued … )

**B.**

BRC's complaint sets out three counts. It alleges: (1) that Continental breached the Agreement by refusing to supply BRC with its requirements of carbon black at the prices and terms set forth in the Agreement; (2) that BRC is entitled to a declaration that Continental is obligated to provide BRC with its requirements of carbon black pursuant to the terms of the Agreement; and (3) that Continental anticipatorily repudiated the Agreement by failing to provide assurances about its future performance.[9] In the third and final count, BRC relies upon sections 26-1-2-610 and 26-1-2-712 of the Indiana Code, which govern, respectively, "[a]nticipatory [r]epudiation" and "[c]over" for a "buyer's procurement of substitute goods." Ind. Code §§ 26-1-2-610, 26-1-2-712. The complaint refers to the Agreement as a "requirements contract" multiple times.[10]

Prior to discovery, the parties filed cross-motions for summary judgment based on competing interpretations of the Agreement. Continental contended that the Agreement

---

( … continued)

ing that time, the parties attempted to reach a resolution. However, in September 2011, BRC ceased ordering carbon black from Continental and entered into a three-year agreement with another supplier at prices exceeding those in the contract by $.11 to $.15 per pound. Continental ultimately provided more than 1.8 million pounds of carbon black to BRC at contract prices in 2011.

[9] The district court's jurisdiction was premised on the diversity statute, 28 U.S.C. § 1332. The parties are citizens of different states, and BRC seeks well over $75,000 in damages.

[10] R.6 at 2, 5.

is merely an open offer for orders—not a binding contract—
and that Continental, therefore, could not have breached it
by repudiation or otherwise. In the alternative, Continental
argued that the Agreement is a contract to sell a specific
quantity of carbon black rather than a requirements contract.
BRC maintained that the Agreement is a requirements con-
tract, or an agreement by which Continental promised to
supply all of BRC's requirements for carbon black during the
term. According to BRC, Continental had repudiated the
Agreement by failing to satisfy BRC's order, as well as by
sending equivocal messages about the satisfaction of future
orders and by demanding higher prices and accelerated
payment terms.

The district court applied Indiana law and concluded
that the Agreement is a requirements contract.[11] Although it
granted partial summary judgment to BRC on that ground,
the court denied summary judgment on the questions of
breach and anticipatory repudiation. The parties continued
with discovery, and BRC later moved for summary judg-
ment on the question of liability. The court again ruled in
BRC's favor; it found that Continental had repudiated the
Agreement by refusing to supply all of BRC's requirements
and by failing to provide assurances of continued perfor-
mance. After granting summary judgment on liability, the
court conducted a bench trial on damages. It awarded BRC

---

[11] As a federal court sitting in diversity, the district court applied the
substantive law of the forum state: Indiana. *See Land v. Yamaha Motor
Corp., U.S.A.*, 272 F.3d 514, 516 (7th Cir. 2001).

$982,643.11 based on the "cover" that BRC had purchased from other suppliers through June 30, 2013.[12]

Continental appealed the final judgment to this court.[13] It challenged the district court's interpretation of the Agreement as a requirements contract, emphasizing that the Agreement does not obligate BRC to buy *any* amount of carbon black, let alone *all* of its required carbon black, from Continental. We agreed with this reasoning and vacated the district court's judgment. *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 804 F.3d 1229, 1233 (7th Cir. 2015). We did not address the questions of breach or repudiation. Rather, given that the prior "judgment against Continental was premised on the agreement being a requirements contract," we remanded the case for further proceedings. *Id.*

On remand, the district court ordered the parties to submit new cross-motions for summary judgment in light of our decision. Continental argued that BRC's claims now fail as a matter of law because if the Agreement is not a requirements contract, it must be an unenforceable "buyer's option" that lacks mutuality and consideration.[14] Continental also claimed that the Agreement is unenforceable because it lacks essential terms, particularly a precise quantity of total carbon black and of each grade of carbon black. It further argued, in the alternative, that even if the Agreement is enforceable, Continental had upheld its end of the bargain by supplying

---

[12] R.110 at 14, 20.

[13] BRC cross-appealed an issue related to damages, which is irrelevant to the present appeal.

[14] R.156-1 at 11.

BRC with 1.35 million pounds of carbon black by June 2011, and by assuring BRC that it would provide the remainder of 1.8 million pounds by the end of the year.

In its cross-motion for summary judgment, BRC contended that our earlier decision "does not change the validity of the Supply Agreement as a valid or enforceable contract, its breach by Continental, or BRC's entitlement to damages."[15] From BRC's perspective, even if the Agreement is not a requirements contract, it is nonetheless an "enforceable agreement requiring Continental to sell at least 1.8 million pounds of carbon black annually to BRC."[16] Therefore, BRC claimed, Continental anticipatorily repudiated the Agreement when it failed to fulfill BRC's order, demanded higher prices and accelerated payment terms, and sent equivocal messages about its intent to provide even 1.8 million pounds per year. BRC maintained that under its admittedly revised theory of the contract, it still was entitled to cover its damages and seek reimbursement from Continental.

The district court granted summary judgment to Continental. It held that BRC's claims fail as a matter of law because they are "premised entirely on the Supply Agreement being a requirements contract."[17] The court reasoned that "BRC's claims in its amended complaint do not allege any alternative theory of the contract under which it could re-

---

[15] R.168 at 2.

[16] *Id*.

[17] R.173 at 9.

cover any damages from Continental."[18] The court also ruled, in the alternative, that the Agreement is an unenforceable "buyer's option" because it lacks the requisite mutuality and consideration.[19] Given these holdings, both of which are independently dispositive, the court did not reach the questions of breach or repudiation.

BRC then brought this appeal. It challenged both of the district court's holdings. For the reasons set out in some detail in the following paragraphs, we now reverse the district court's judgment. The Agreement does not fail for lack of consideration or mutuality; it is an enforceable contract. Furthermore, BRC's claims do not fail as a matter of law. BRC was permitted to change its legal theory following our previous remand, and the factual allegations in its complaint are sufficient to state a claim under its revised construction of the Agreement.

## II

## DISCUSSION

We review the district court's decision on summary judgment de novo. *E.T. Prods., LLC v. D.E. Miller Holdings, Inc.*, 872 F.3d 464, 467 (7th Cir. 2017). Summary judgment is proper when the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, we, like the district

---

[18] *Id.* at 10.

[19] *Id.* at 15.

court, view the record in the light most favorable to the nonmoving party; if a reasonable factfinder could return a verdict in favor of that party, the motion must be denied. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## A.

We begin with the district court's holding that the Agreement is unenforceable for lack of mutuality and consideration. The court reasoned that "[b]ecause the Supply Agreement is not a requirements contract, and because even the 'Meet or Release' provision in the Supply Agreement does not require BRC to purchase carbon black exclusively from Continental, there is no mutuality of obligation in the Supply Agreement. [It] is therefore unenforceable for lack of consideration."[20] The court went on to adopt Continental's characterization of the Agreement as an unenforceable "buyer's option," or "open offer to sell."[21]

We review the district court's interpretation of the Agreement de novo. *BKCAP, LLC v. Captec Franchise Tr. 2000-1*, 572 F.3d 353, 358 (7th Cir. 2009); *Kokomo Veterans, Inc. v. Schick*, 439 N.E.2d 639, 643 (Ind. Ct. App. 1982) (noting that the construction of an unambiguous contract is a question of law).[22] For the reasons explained in the following

---

[20] *Id.* at 15.

[21] *Id.* at 16.

[22] We previously treated the language of the Agreement as unambiguous. *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 804 F.3d 1229, 1231 (7th Cir. 2015). The parties do not contest that characterization.

paragraphs, we hold that the Agreement is supported by mutuality and consideration and is, thus, enforceable.

Under Indiana law, a contract must impose mutual obligations on the parties in order to be enforceable. *Terre Haute Reg'l Hosp., Inc. v. El-Issa*, 470 N.E.2d 1371, 1377 (Ind. Ct. App. 1984). "If both parties to the [Agreement] are not bound, neither is bound," *id.*, and consideration is lacking. Obligations that give rise to consideration can take the form of legal benefits or legal detriments. *Kelly v. Levandoski*, 825 N.E.2d 850, 860 (Ind. Ct. App. 2005) ("A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled. A detriment, on the other hand, is a legal right the promisee has forborne." (citation omitted) (quoting *DiMizio v. Romo*, 756 N.E.2d 1018, 1023 (Ind. Ct. App. 2001))). Furthermore, the obligations on both parties must be "reasonably definite and certain," *Zeyher v. S.S. & S. Mfg. Co.*, 319 F.2d 606, 607 (7th Cir. 1963) (applying Indiana law); they cannot be illusory promises that, by their terms, make performance entirely optional, *Pardieck v. Pardieck*, 676 N.E.2d 359, 364 n.3 (Ind. Ct. App. 1997). That said, so long as a contract imposes definite obligations on both parties, courts do not question whether the value of consideration is adequate. *Tanton v. Grochow*, 707 N.E.2d 1010, 1013 (Ind. Ct. App. 1999).

Here, the Agreement imposes sufficiently definite obligations on both parties. Continental is obligated to make available "approximately 1.8 million pounds of prime [carbon] black annually … to be taken in approximately equal monthly quantities," at the baseline prices set out "firm[ly]" in the

Agreement.[23] In return, BRC has accepted a legal detriment under the "Meet or Release" provision, which is "naturally read as a 'right of first refusal,' meaning *if* BRC sought to buy carbon black from another seller at a lower price, Continental had to be given the chance to meet that price." *BRC Rubber & Plastics, Inc.*, 804 F.3d at 1232. As we noted in the previous appeal, BRC is not obligated to purchase any carbon black from Continental; BRC can purchase it at higher prices from other suppliers or it can produce its own. However, BRC is prohibited from purchasing carbon black from other suppliers on better terms than the Agreement unless Continental reviews the offer and decides not to match it.

Under Indiana law, a right of first refusal to sell can support mutuality of obligation. *Cf. Hyperbaric Oxygen Therapy Sys., Inc. v. St. Joseph Med. Ctr. of Fort Wayne, Inc.*, 683 N.E.2d 243, 245 (Ind. Ct. App. 1997) (upholding contract where one party provided the other with "the right to match the lowest responsive bid or highest ranked proposal to sell").[24] The Indiana Court of Appeals has described a right of first refusal as "a 'valuable contractual right' in which the right-holder may 'preempt' a third-party offer for a protected interest." *B&R Oil Co. v. Stoler*, 77 N.E.3d 823, 828 (Ind. Ct.

---

[23] R.6-1 at 1.

[24] Although rights of first refusal most commonly appear in real property transactions, the Indiana Court of Appeals has concluded that "the subject matter [of such a right] may be anything which parties may make the subject of contracts," which includes "an owner [who] may by contract with a prospective buyer obtain a [f]irst [r]ight to [s]ell." *Hyperbaric Oxygen Therapy Sys., Inc. v. St. Joseph Med. Ctr.*, 683 N.E.2d 243, 249 (Ind. Ct. App. 1997).

App. 2017). Furthermore, the value of a right of first refusal is not undermined by its conditional nature. *See Saviano v. Comm'r of Internal Revenue*, 765 F.2d 643, 653 (7th Cir. 1985) (recognizing conditional right of first refusal). Therefore, the right that Continental acquired through the "Meet or Release" provision is not legally diminished as a result of its limited application to only those offers that are "better" than the terms of the Agreement. It is not our place to question the value of this consideration. *See Tanton*, 707 N.E.2d at 1013.

On the other side of the bargain, Continental has promised to make available to BRC approximately 1.8 million pounds of carbon black per year at the stated prices. Contrary to Continental's argument, mutuality of obligation does not require that "the seller … be required to sell and the buyer … be required to buy."[25] It is clear under Indiana law that "the doctrine of mutuality of obligation does not require that every duty within an agreement be based upon a corresponding obligation." *Terre Haute Reg'l Hosp.*, 470 N.E.2d at 1377. Therefore, BRC's obligation under the Agreement need not mirror that of Continental; it is not the case that the seller be required to sell and the buyer be required to buy. *See id.* ("Certainly a contract does not become unenforceable merely because the obligations of the parties differ in quality or quantity."). Because the Agreement imposes a definite obli-

---

[25] Appellee's Br. 24.

gation on both parties, there is mutuality and consideration.[26]

Continental's final argument is that the Agreement fails because it lacks essential terms, specifically, precise quantity terms for the total amount of carbon black and for each grade of carbon black. Even if a contract is supported by consideration, it "is unenforceable if it is so indefinite and vague that the material provisions cannot be ascertained." *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 759 (7th Cir. 2001) (quoting *Pepsi-Cola Gen. Bottlers v. Woods*, 440 N.E.2d 696, 699 (Ind. Ct. App. 1982)); *see Wolvos v. Meyer*, 668 N.E.2d 671, 676 (Ind. 1996) ("[E]ssential terms need [to] be included in order to render a contract enforceable."). However, "[e]ven though one or more terms are left open[,] a

---

[26] We therefore cannot accept the district court's characterization of the Agreement as a "buyer's option," or an "open offer to sell." A "buyer's option" arises when a seller invites a buyer "to purchase as much or as little product as it want[s] during" a specific period of time "at the prices set forth on [a p]rice [l]ist." *Auto. Hardware Serv., Inc. v. Accubuilt, Inc.*, No. 1:08-CV-202, 2009 WL 3246676, at *6 (N.D. Ind. Oct. 6, 2009). The district court relied on our decision in *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 378–79 (7th Cir. 2000), where we considered an agreement to be a "buyer's option" because it did not obligate the buyer to purchase anything from the seller; it merely specified price points for the buyer's potential purchases within a specified period of time. The present contract is different. In *Brooklyn Bagel Boys*, the buyer did not suffer any legal detriment as consideration for the seller's open offer. *See id.* Here, in contrast, BRC gave up a right to purchase below the prices agreed upon with Continental without first affording Continental the opportunity to examine any such offer and meet the price. In exchange, it obtained the option to purchase 1.8 million pounds of carbon black at the specified prices.

contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Ind. Code § 26-1-2-204(3); *see also E.C. Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912, 917 (7th Cir. 2007) (noting that "the UCC takes a liberal view towards what is required to create a contract for the sale of goods").

This agreement is sufficiently definite to be enforceable. The Agreement expressly states that it "is the intent of this Agreement that [Continental] agrees to sell to [BRC] approximately 1.8 million pounds of prime [carbon] black annually."[27] The parties' intent to be bound is evidenced throughout the Agreement, with references to "obligation[s]" and terms that are "to remain firm."[28] The approximation of the annual quantity does not undermine the definiteness of the contract. *See* Indiana Law Encyclopedia 279, § 24 cmt. ("The required writing need not contain all the material terms of the contract, and such material terms as are stated need not be precisely stated … ."); *cf. S. Concrete Servs., Inc. v. Mableton Contractors, Inc.*, 407 F. Supp. 581, 584, 584 n.2 (N.D. Ga. 1975) (finding the description of "approximately 70,000 cubic yards" to be a valid "essential term" in a supply agreement), *aff'd*, 569 F.2d 1154 (5th Cir. 1978). Earlier in this litigation, Continental explained aptly the commercial purpose of such an approximation, which is "intended to allow for a reasonable and defined degree of variation in the annual quantity

---

[27] R.6-1 at 1.

[28] *Id.*

sold; otherwise, the occurrence of such variations might cause either party to be in breach of the Agreement."[29]

Lastly, the lack of a specific quantity for each grade does not undermine the definiteness of the Agreement. *See* Ind. Code § 26-1-2-311(2) ("Unless otherwise agreed, specifications relating to assortment of goods are at the buyer's option … .").[30] The lack of specificity with respect to the anticipated quantity of each grade of carbon black is quite compatible with the Agreement's function as a supply contract among entities operating at different tiers in the manufacturing process. Although a manufacturer in this situation may be able to estimate its overall manufacturing capacity or projected orders for a set period of time, its actual needs for particular grades of a commodity may vary as individual orders

---

[29] R.32 (Continental's Memorandum in Support of Summary Judgment) at 11.

[30] Continental points us to the Statute of Frauds, codified at section 26-1-2-201 of the Indiana Code, which specifies the terms that must appear in a contract for the sale of goods of $500 or more. The comments to this section indicate that the "only term which *must* appear is the quantity term." Ind. Code § 26-1-2-201 cmt. 1 (emphasis added). However, Continental fails to read the entire commentary, which clarifies that the quantity term "need not be accurately stated" although "recovery is limited to the amount stated." *Id.* The text of the Statute of Frauds itself further clarifies that a "writing is not insufficient because it omits … a term agreed upon, but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing." *Id.* § 26-1-2-201(1). Accordingly, the Statute of Frauds does not render a contract invalid due to an imprecise quantity term. *See* U.C.C. § 2-201:180 ("The fact that a quantity term is not precise is not fatal to the claim that a writing satisfies the Statute of Frauds."). It simply caps the quantity of goods for which Continental can be held liable.

are received. Building into its supply contract sufficient nimbleness to meet these contingencies does not alter the essential terms of the contract. Both parties recognize the need to make such adjustments and accept the attendant risk as a necessary component of the commercial relationship. Given the function of the Agreement as a supply contract, we cannot say on this record that such flexibility is anything other than a realistic arrangement.

**B.**

The district court's alternative ground for granting summary judgment focused on the sufficiency of BRC's complaint. As we have noted, the district court concluded that our previous holding was fatal to BRC's case because the complaint does "not allege any alternative theory of the contract under which [BRC] could recover any damages."[31] Based on our review of the complaint and the controlling principles governing contemporary federal pleading standards, we respectfully must part company with our colleague in the district court.[32]

The principles that govern our analysis were set forth succinctly in *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852 (7th Cir. 2017):

---

[31] R.173 at 10.

[32] Although we apply the substantive law of Indiana, we apply federal rules of procedure, including the federal standards of pleading. *See Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 750 (7th Cir. 2005).

When a new argument is made in summary judgment briefing, the correct first step is to consider whether it changes the complaint's factual theory, or just the legal theories [the] plaintiff has pursued so far. In the former situation, the plaintiff may be attempting in effect to amend its complaint, and the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims. In the latter, the court should consider the consequences of allowing the plaintiff's new theory. If it would, for example, "cause unreasonable delay," or make it "more costly or difficult" to defend the suit, "the district court can and should hold the plaintiff to his original theory."

*Id.* at 860 (italics in original) (citations omitted) (quoting *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996)). We shall now examine these principles in some detail and apply them to the case before us today.

The Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and their progeny enunciate the principles that must guide our evaluation of the complaint before us. A complaint must "state a claim to relief that is plausible on its face." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (quoting *Twombly*, 550 U.S. at 570). A court must be able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Factual allegations "that are 'merely consistent with' a defendant's liability" do not pass the criti-

cal "line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Of course, "plausibility, probability, and possibility overlap," *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010), so courts still must exercise some degree of judgment in evaluating the sufficiency of a complaint.

Although this standard is more rigorous than the one employed in earlier times, it remains true that a plaintiff need not plead legal theories. *See Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 808 (7th Cir. 2014). Furthermore, "when a plaintiff does plead legal theories, it can later alter those theories," and "there is no burden on the plaintiff to justify altering its original theory." *Chessie*, 867 F.3d at 859 (alteration omitted) (quoting *Vidimos*, 99 F.3d at 222).

However, as we already have noted, although a plaintiff generally can alter the legal theories asserted in its complaint, it cannot alter "the factual basis of [its] complaint at summary judgment." *Whitaker*, 772 F.3d at 808. Such an alteration would be "an unacceptable attempt to amend the pleadings through summary judgment argument." *Id.* at 807; *see also Chessie*, 867 F.3d at 860. Two of our cases illustrate the relevant distinction. In *Whitaker*, we accepted the plaintiff's switch from her original theory of an "agency" relationship (between the defendant and a third party) to her revised theory of a "joint employer" relationship. *Whitaker*, 772 F.3d at 807. We explained that this change did not alter the "fundamental factual allegation" in the complaint; the plaintiff merely had "offered an alternative legal characterization of the factual relationship." *Id.* at 808–09. By contrast, in *Chessie*, we rejected the plaintiff's alteration of his original theory because it necessarily altered the fundamental factual allega-

tions in his complaint. *Chessie*, 867 F.3d at 860–61. There, the plaintiff originally presented a case based on common law negligence but, on summary judgment, switched it to a negligence per se case. We rejected this revision because proceeding as a negligence per se case required the fundamental factual allegation that the plaintiff was injured by the defendant's *removal* of dirt from near the plaintiff's property, whereas the original theory had rested on the allegation that his injury arose from the defendant's *dumping* of dirt on the plaintiff's property. *Id.* at 861. The facts needed to support his new legal theory were inconsistent with his original factual allegations.

As explained in *Chessie*, if a complaint alters only the plaintiff's legal theory and not its factual allegations, the court next must consider the consequences of allowing the case to proceed under the new theory. *See id.* at 860. "If it would, for example, 'cause unreasonable delay,' or make it 'more costly or difficult' to defend the suit, 'the district court can and should hold the plaintiff to his original theory.'" *Id.* (quoting *Vidimos*, 99 F.3d at 222).

Given these firm principles, our task is to determine whether BRC's revised interpretation of the Agreement alters the factual basis of its complaint or only the legal theory upon which BRC wishes to recover. We must therefore determine whether BRC's original factual allegations state a plausible claim to relief under BRC's new construction of the Agreement. If we conclude that BRC's new argument alters only its legal theory, then we must examine the consequences of allowing BRC to proceed under this new theory, with an eye toward unreasonable delay of the case and difficulties posed to the defendant.

Our assessment of the adequacy of BRC's pleadings requires that we have a firm understanding of the substantive law on which BRC now bases its claim: the law of anticipatory repudiation. Indiana courts recognize the general principle that "[r]epudiation of a contract must be positive, absolute, and unconditional." *Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 692 N.E.2d 905, 911 (Ind. Ct. App. 1998). They also recognize that, in certain circumstances, repudiation can be effectuated by a party's failure to provide adequate assurance of future performance. *See Hawa v. Moore*, 947 N.E.2d 421, 426–27 (Ind. Ct. App. 2011). BRC has alleged that Continental repudiated the Agreement by failing to provide adequate assurances, so that framework guides our analysis.

Indiana has adopted a version of the Uniform Commercial Code's ("UCC") provision governing the "[r]ight to adequate assurance of performance." *See* Ind. Code § 26-1-2-609.[33] This section generally "provides that a party feeling insecure about the other party's contract performance may seek assurance of performance." *Wildwood Indus., Inc. v. Genuine Mach. Design, Inc.*, 587 F. Supp. 2d 1035, 1047 (N.D. Ind. 2008). It reads:

> (1)   A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be im-

---

[33] The parties agree that Indiana law governs our substantive interpretation of the Agreement. Because the contract relates to the sale of goods, Indiana's version of the UCC applies. Ind. Code § 26-1-2-102. Furthermore, both of the parties qualify as "merchants" for purposes of the Indiana Code. *Id.* § 26-1-2-104.

paired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2)   Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

… .

(4)   After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty (30) days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

Ind. Code § 26-1-2-609.

The provision "rests on the recognition … that a continuing sense of reliance and security that the promised performance will be forthcoming when due[] is an important feature of the bargain." *Id.* cmt. 1. "If either the willingness or the ability of a party to perform declines materially between the time of contracting and the time for performance, the other party is threatened with the loss of a substantial part of what he has bargained for." *Id.* Accordingly, "a buyer who believes that the seller's deliveries have become uncertain cannot safely wait for the due date of performance when he

has been buying to assure himself of materials for his current manufacturing or to replenish his stock of merchandise." *Id.*

"'[R]easonable' grounds and 'adequate' assurance [are] defined by commercial rather than legal standards." *Id.* cmt. 3. Therefore, what constitutes "reasonable" grounds and "adequate" assurance are questions of fact that turn on the "nature of the sales contract" and the circumstances of the particular case. *Id.* cmts. 3, 4; *see also AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170 (7th Cir. 1976) ("Whether in a specific case a buyer has reasonable grounds for insecurity is a question of fact."); *Phibro Energy, Inc. v. Empresa De Polimeros De Sines Sarl*, 720 F. Supp. 312, 322 (S.D.N.Y. 1989) (noting that the "standard is high for a finding of insecurity as a matter law," given that the reasonableness of a party's insecurity is a context-specific question of fact). Notably, "a ground for insecurity need not arise from or be directly related to the contract in question," so a buyer "may have reasonable grounds for insecurity if he discovers that his seller is making defective deliveries … to other buyers with similar needs." Ind. Code § 26-1-2-609 cmt. 3. That said, a buyer's insecurity "must be based upon reason and must not be arbitrary or capricious;" a buyer's subjective dissatisfaction does not negate a seller's assurance if that assurance is commercially adequate. *Id.* cmt. 4. "Indiana case law interpreting and applying [section] 26-1[-]2-609 is sparse," but the cases make one thing clear: the reasonableness of a buyer's insecurity and the adequacy of a seller's assurances are "very fact-specific" and "very context-specific" inquiries. *Beijing Auto. Indus. Imp. & Exp. Corp. v. Indian Indus., Inc.*, 105 F. Supp. 3d 879, 897, 900 (S.D. Ind. 2015).

Measuring the allegations of the complaint against Indiana's law of anticipatory repudiation, we conclude that BRC's factual allegations plausibly allege that Continental repudiated the Agreement by failing to provide adequate assurances of performance. BRC has alleged plausibly that it had "reasonable grounds for insecurity," that it demanded "adequate assurance of due performance," and that Continental failed to provide assurance "as is adequate under the circumstances of the particular case." Ind. Code § 26-1-2-609. The following allegations are particularly relevant to our conclusion. The complaint alleges that Continental did not fulfill BRC's order placed in late April 2011, and that Continental was refusing to complete requested shipments to other buyers at the same time. Furthermore, Continental attempted to increase the baseline prices despite the Agreement's specification that the prices were to "remain firm."[34] When BRC requested an assurance of performance in writing, Continental responded equivocally, first telling BRC to "call another supplier," then stating that it would "continue producing and shipping timely at the contract prices," and later tempering this assurance with the message that it would "do the best [it] can re future orders."[35] Following these communications, Continental continued to seek price increases as well as accelerated payment terms.[36]

---

[34] R.6-1 at 1.

[35] R.6 at 5.

[36] We are cognizant that the complaint describes the Agreement as a "requirements contract." However, a plaintiff "cannot plead [it]self out of court by citing to the wrong legal theory" or the wrong legal authority. *Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 764 (7th Cir.

(continued … )

We emphasize that we make no prediction about how BRC might fare at trial. Based on these allegations, however, BRC's claim of repudiation does not fail as a matter of law. The plausibility of BRC's claim is not undermined by the circumstantial nature of the facts alleged in support of repudiation. *See Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc.*, 933 P.2d 417, 422 (Wash. Ct. App. 1997) ("An intent to repudiate may be expressly asserted or circumstantially manifested by conduct." (quoting *CKP, Inc. v. GRS Constr. Co.*, 821 P.2d 63, 74 (Wash. Ct. App. 1991))). Even if the Agreement did not require Continental to provide more than 1.8 million pounds of carbon black per year, the mosaic of alleged conduct plausibly supports a claim that BRC had reasonable grounds for insecurity and that Continental failed to provide adequate assurances. Furthermore, BRC's revised theory of the Agreement does not depend on any essential allegations that are missing from its complaint. From the start, BRC has maintained that Continental repudiated the Agreement by failing to fulfill an order, seeking increased prices and accelerated payment terms, and providing equivocal assurances of future performance. BRC has altered only its legal charac-

---

( … continued)

1999); *see Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010) ("Even citing the wrong statute needn't be a fatal mistake[] … ."). We also note the allegation that Continental "made clear that it was no longer interpreting the Agreement as a requirements contract." R.6 at 5. Although this particular allegation no longer supports BRC's claim of repudiation, it is neither necessary to nor inconsistent with BRC's new theory. Therefore, the change in BRC's legal theory does not require a fundamental alteration in its factual allegations, as was the case in *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 861 (7th Cir. 2017).

terization of the Agreement; its factual theory of the case has remained constant. Whether its allegations add up to "positive, absolute, and unconditional" repudiation, *Jay Cty.*, 692 N.E.2d at 911, is a question properly reserved for the trier of fact.

Next, we must consider whether allowing BRC to advance its new legal theory unfairly harms the development of the case or the defendant. We have recognized such harms when the case is delayed unreasonably or becomes "'more costly or difficult' to defend." *Chessie*, 867 F.3d at 859 (quoting *Vidimos*, 99 F.3d at 222). This record provides no basis for our concluding that BRC's new characterization of the Agreement harms the development of the case or Continental's defense. Notably, at earlier stages in this litigation, Continental advanced the same construction of the contract that BRC now endorses.[37] In these circumstances, Continental certainly is not prejudiced by BRC's new argument, which, in a strict sense, is not new to this case at all.

## C.

We briefly consider Continental's suggestion that we decide as a matter of law whether Continental anticipatorily repudiated the Agreement. We decline to do so for the simple reason that the relevant inquiries—whether BRC had reasonable grounds for insecurity and whether Continental provided adequate assurance—are highly fact-specific and

---

[37] *See, e.g.*, R.32 at 10 (arguing in the alternative that the Agreement "is a contract for the sale of a specific amount of goods—1.8 million pounds per year"); R.39 at 4 (same).

context-specific. The parties' divergent characterizations of the facts in their briefs illustrate just how differently reasonable factfinders might interpret the record. This record simply affords no basis for our deciding these questions as a matter of law.

## Conclusion

In sum, we conclude that the Agreement is supported by mutuality of obligation and, thus, consideration. The Agreement is not an unenforceable "buyer's option" and does not fail for a lack of essential terms. We also conclude that BRC's complaint alleges adequately a claim of anticipatory repudiation under its revised theory of the Agreement. These revisions alter only BRC's legal theory, not the fundamental factual basis for its claim. Nor do they prejudice Continental or unreasonably delay the case. We, therefore, hold that BRC's repudiation claim does not fail as a matter of law as a result of our prior holding. Given the highly fact-specific nature of the remaining inquiries, we decline to decide as a matter of law whether Continental repudiated the Agreement. BRC may recover its costs of this appeal.

REVERSED and REMANDED